# ATTACHMENT A

**ATTACHMENT A**

**STATEMENT OF FACTS**

This Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement, dated February 6, 2013, between the United States Department of Justice, Criminal Division, Fraud Section, Antitrust Division, and The Royal Bank of Scotland plc ("RBS"). RBS hereby agrees and stipulates that the following information is true and accurate. RBS admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Should the Department pursue the prosecution that is deferred by this Agreement, RBS agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. If this matter were to proceed to trial, the Department would prove beyond a reasonable doubt, by admissible evidence, the facts alleged below and set forth in the criminal Information attached to this Agreement. This evidence would establish the following:

I.

BACKGROUND

A. *LIBOR*

1. Since its inception in approximately 1986, the London Interbank Offered Rate ("LIBOR") has been a benchmark interest rate used in financial markets around the world. Futures,

1

options, swaps, and other derivative financial instruments traded in the over-the-counter market and on exchanges worldwide are settled based on LIBOR. The Bank of International Settlements has estimated that in the second half of 2009, for example, the notional amount of over-the-counter interest rate derivative contracts was valued at approximately $450 trillion. In addition, mortgages, credit cards, student loans, and other consumer lending products often use LIBOR as a reference rate.

2.    LIBOR is published under the auspices of the British Bankers' Association ("BBA"), a trade association with over 200 member banks that addresses issues involving the United Kingdom banking and financial services industries. The BBA defines LIBOR as:

> The rate at which an individual Contributor Panel bank could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size, just prior to 11:00 [a.m.] London time.

This definition has been in place since approximately 1998.

3.    LIBOR rates were initially calculated for three currencies: the United States Dollar, the British Pound Sterling, and the Japanese Yen. Over time, the use of LIBOR expanded, and benchmark rates were calculated for ten currencies, including the original three.

4.    The LIBOR for a given currency is the result of a calculation based upon submissions from a panel of banks for

that currency (the "Contributor Panel") selected by the BBA. Each member of the Contributor Panel submits its rates every London business day through electronic means to Thomson Reuters, as an agent for the BBA, by 11:10 a.m. London time. Once each Contributor Panel bank has submitted its rate, the contributed rates are ranked. The highest and lowest quartiles are excluded from the calculation, and the middle two quartiles (i.e., 50% of the submissions) are averaged to formulate the resulting LIBOR "fix" or "setting" for that particular currency and maturity.

5. The LIBOR contribution of each Contributor Panel bank is submitted to between two and five decimal places, and the LIBOR fix is rounded, if necessary, to five decimal places. In the context of measuring interest rates, one "basis point" (or "bp") is one-hundredth of one percent (0.01%).

6. Thomson Reuters calculates and publishes the rates each business day by approximately 11:30 a.m. London time. Fifteen maturities (or "tenors") are quoted for each currency, ranging from overnight to twelve months. The published rates are made available worldwide by Thomson Reuters and other data vendors through electronic means and through a variety of information sources. In addition to the LIBOR fix resulting from the calculation, Thomson Reuters publishes each Contributor Panel bank's submitted rates along with the names of the banks.

7.    According to the BBA, each Contributor Panel bank must submit its rate without reference to rates contributed by other Contributor Panel banks. The basis for a Contributor Panel bank's submission, according to a clarification the BBA issued in June 2008, must be the rate at which members of the bank's staff primarily responsible for management of the bank's cash, rather than the bank's derivatives trading book, consider that the bank can borrow unsecured inter-bank funds in the London money market. Further, according to the BBA, a Contributor Panel bank may not contribute a rate based on the pricing of any derivative financial instrument. In other words, a Contributor Panel bank's LIBOR submissions should not be influenced by its motive to maximize profit or minimize losses in derivatives transactions tied to LIBOR.

8.    From at least 2006 through 2010, RBS has been a member of the Contributor Panels for a number of currencies, including Yen LIBOR and Swiss Franc LIBOR, which are the focus of this Statement of Facts. The Contributor Panel for Yen LIBOR from at least 2006 through 2010 was comprised of 16 banks, including RBS. Presently, there are 13 banks on the Yen Contributor Panel, including RBS. The Contributor Panel for Swiss Franc LIBOR from at least 2008 through 2009 was comprised of 12 banks, including RBS. Presently, there are 11 banks on the Swiss Franc Contributor Panel, including RBS.

4

9.     Because of the widespread use of LIBOR and other benchmark interest rates in financial markets, these rates play a fundamentally important role in financial systems around the world.

## B.     *Interest Rate Swaps*

10.     An interest rate swap ("swap") is a financial derivative instrument in which two parties agree to exchange interest rate cash flows. If, for example, a party has a transaction in which it pays a fixed rate of interest but wishes to pay a floating rate of interest tied to a reference rate, it can enter into an interest rate swap to exchange its fixed rate obligation for a floating rate one. Commonly, for example, Party A pays a fixed rate to Party B, while Party B pays a floating interest rate to Party A indexed to a reference rate like LIBOR. There is no exchange of principal amounts, which are commonly referred to as the "notional" amounts of the swap transactions. Interest rate swaps are traded over-the-counter; in other words, they are negotiated in transactions between counterparties and are not traded on exchanges.

## C.     *RBS*

11.     RBS is a financial services corporation with headquarters located in Edinburgh, Scotland. RBS has banking divisions and subsidiaries around the world, including in the United States, with its United States headquarters located in

Stamford, Connecticut. From 2006 to 2010, one of RBS's divisions was Global Banking and Markets ("GBM"). The GBM division had employees in multiple legal entities associated with RBS, including RBS Securities Japan Limited ("RBSSJ"). RBSSJ is a wholly-owned subsidiary of RBS that engages in investment banking operations, including derivatives trading, with its principal place of business in Tokyo, Japan. RBS, through its GBM division, employed money market traders and derivatives traders[1] throughout the world, including in New York, London, and Tokyo. RBS's derivatives traders are responsible for trading a variety of financial instruments, some of which, such as interest rate swaps and forward rate agreements,[2] are tied to LIBOR. RBS's money market traders are responsible for, among other things, trading cash and ensuring that RBS has sufficient funding with regard to specific currencies.

D.   *RBS's LIBOR Submissions*

12.   RBS's LIBOR submissions were made by designated LIBOR submitters. With regard to Yen and Swiss Franc, the primary

_____

[1] The term "derivatives traders" includes traders on RBS's short-term interest rates desks. These desks were responsible for shorter-term derivatives trading books.

[2] A forward rate agreement is a derivative contract in which parties specify a rate of interest or currency exchange rate to be paid or received on a notional amount at a future date. Unlike an interest rate swap, which typically provides for an exchange of cash flows over a period of years, a forward rate agreement terminates on the specified settlement date.

LIBOR submitter was a money market trader based in London ("Submitter-1"). Other money market traders in these currencies served as backup submitters at certain times when the primary submitter was unavailable to make submissions. In addition, at various times between 2006 and 2010, RBS permitted derivatives traders who traded Yen and Swiss Franc products to serve as backup submitters.

13.  At various times from at least 2006 through 2010, certain RBS Yen and Swiss Franc derivatives traders – whose compensation from RBS was directly connected to their success in trading financial products tied to LIBOR – attempted to manipulate and did manipulate RBS's LIBOR submissions for the benchmark interest rates in those currencies in order to benefit their derivatives trading positions.

II.

## RBS'S MANIPULATION OF
## LIBOR SUBMISSIONS

14.  From as early as 2006 through at least 2010, certain RBS derivatives traders requested and obtained LIBOR submissions that benefited their trading positions. These derivatives traders requested that certain RBS LIBOR submitters submit benchmark interest rate contributions that would benefit the traders' trading positions, rather than rates that complied with the definition of LIBOR. These derivatives traders either

requested a particular LIBOR contribution for a particular tenor and currency, or requested that the rate submitter contribute a rate higher, lower, or unchanged for a particular tenor and currency.

15.  Derivatives traders often made these requests through electronic messages in chat rooms set up by traders to share information about particular trading topics, though at various times the requests were made orally and, less frequently, by phone.  Submitter-1 on many occasions agreed to accommodate derivatives traders' requests for favorable benchmark interest-rate submissions with regard to Yen LIBOR and Swiss Franc LIBOR, and backup submitters did the same.

16.  During the period when derivatives traders were requesting favorable LIBOR submissions and submitters were accommodating those requests, RBS lacked a compliance program sufficient to detect and prevent the conduct.

A.  *Yen LIBOR*

17.  The market for derivatives and other financial products linked to Yen LIBOR is global and is one of the largest and most active markets for such products in the world.  A number of these products are traded in the United States – such as Yen-based swaps contracts traded over the counter – in transactions involving U.S.-based counterparties.  For example, more than 15% of the total notional value of the transactions

entered into by RBS's Yen derivatives traders from 2006 through 2010 involved U.S.-based counterparties often acting through their overseas offices.

18.  From approximately mid-2006 through 2010, in London, Tokyo, and elsewhere, a number of RBS employees engaged in efforts to manipulate Yen LIBOR to benefit RBS's trading positions and thereby benefit themselves.[3]  This conduct encompassed hundreds of instances in which RBS employees sought to influence Yen LIBOR rates in two principal ways:  (1) internally at RBS through requests by derivatives traders for favorable LIBOR submissions and (2) through communications with a derivatives trader at another Contributor Panel bank.  Details and examples of this conduct are set forth below.

   1)  *Manipulation Within RBS of its Yen LIBOR Submissions*

19.  Instances of internal efforts to manipulate Yen LIBOR submissions date back at least to 2006, and involve requests from RBS derivatives traders to a Yen LIBOR submitter or a backup Yen LIBOR submitter to submit rates that would benefit their derivatives trading positions.  On many occasions, the RBS submitter accommodated the derivatives traders' requests.

---

[3] Certain RBS derivative traders referenced later in this Statement of Facts earned substantial bonuses during years in which manipulation occurred.  In addition, the trading books of these traders were highly profitable during these years.

20.   Starting as early as August 2006, a Yen derivatives trader in Japan[4] sent requests for favorable LIBOR submissions to a Yen derivatives trader in London, who in turn sometimes indicated he would seek accommodations from Submitter-1.

21.   Starting in early 2007, RBS derivatives traders made more frequent requests for manipulations of the Yen LIBOR submission in order to benefit their trading positions.  This increase in 2007 began shortly after Trader-1[5] in Tokyo began working with Trader-2 in London on the Yen derivatives book, and Trader-3 joined the Yen derivatives swaps desk in London.

22.   Trader-1 and Trader-2 would often discuss their need for LIBOR in a specific tenor to move in a particular direction on a specific day or over a period of days to benefit a Yen derivatives trading position, and Trader-2 generally would pass on the request to Submitter-1.  For example, in an electronic chat on February 14, 2007, involving, among others, Trader-1 and Trader-2, Trader-1 stated,[6] "3m libor seem to be set low today .. we have big fixing tomorrow."[7]  Trader-2 responded "yes," and

---

[4] This derivatives trader, who is also identified in footnote 8, was employed by RBSSJ.

[5] This derivatives trader was employed by RBSSJ until December 2009.  In 2010, Trader-1 was employed by RBS's Singapore branch.

[6] All quotes in this Statement of Facts are presented as in the original text of the document, including grammatical, spelling, and other mistakes.

[7] A "fixing," in this context, refers to the date (of which there typically was more than one) on which at least one party's

10

then asked, "250 fixing tomorrow?" Trader-1 stated "yep," to which Trader-2 then responded, "[Submitter-1] will try for us." The next day, RBS's 3-month Yen LIBOR submission increased four basis points.

23. Trader-1 sometimes passed his requests through other money market traders. For example, in an electronic chat on May 3, 2007, Trader-1 asked a junior derivatives trader who acted as a backup Yen LIBOR submitter, "can you do me a favour? ..can you drop a note to [Submitter-1] (JPY money mkt dealer ) to set low 1m and low 3m JPY libor today please? Thanks." The junior backup submitter responded, "just gave him a shout, said already on it…"

24. Trader-2 also served as a backup LIBOR submitter during times when Submitter-1 was away from the desk, and on some occasions made LIBOR submissions to benefit derivatives trading books. Thus, for example, on August 20, 2007, Trader-1 noted in an electronic chat that "[Trader-2] is the one setting the jpy libor in london now .. for this week and next." The reason was that "[Submitter-1] is on leave." The next day, another Tokyo-based derivatives trader, Trader-4,[8] asked "where's young [Trader-2] thinking of setting it?" Trader-2 responded,

---

obligation under the terms of a derivative contract would be valued for the purpose of exchanging payments. The size of the fixing is based on the notional value involved in the trade.

[8] This trader was employed by RBSSJ.

11

"where would you like it," then "libor that is," then "same as yesterday is call." Trader-4 said, "haha, glad you clarified ! mixed feelings but mostly I'd like it all lower so the world starts to make a little more sense." Trader-1 then weighed in, observing that "the whole HF world will be kissing you instead of calling me if libor move lower." Trader-2 responded, "ok, i will move the curve down . . . 1 bp . . . maybe more . . . if i can." Trader-1 suggested that the time to move was not now: "maybe after tomorrow fixing hehehe." Trader-2 responded, "fine. . . will go with same as yesterday then."

25. At times, derivatives traders who had different trading books and conflicting interests in the direction of LIBOR competed for submissions. On March 27, 2008, for example, Trader-1 and Trader-2 expressed frustration that Trader-3, another Yen derivatives trader based in London, attempted to influence RBS's LIBOR submission. Trader-1 asked Trader-2, "we change the libor lower?," to which Trader-2 responded, "i was in a novation meeting and [Trader-3] asked [a junior Yen derivatives trader serving as a backup Yen LIBOR submitter] to put it low." Trader-1 opined that "[Trader-3] shud have just sqed[9] it with us if he need it lower…cos i dont think they have as big position as us next few weeks…i dont think [Trader-3] or the long end guys shud ever touch the libor…they shd check with

---

[9] The context indicates Trader-1 meant "squared."

us." Trader-2 responded, "i know," and Trader-1 complained that "thats probably gonna cost us 200k gbp[10]."

26.     Later in the same March 27, 2008 electronic chat, Trader-1 and Trader-2 discussed their need to increase LIBOR the next day to benefit their trading position:

> Trader-1:     tomorrow we need to bump it [6-month
>               LIBOR] way up high .. highest among all
>               if possible
>
>         * * * *
>
> Trader-1:     we need to bump up all the way in the
>               3mth libor tomorrow as well
>
> Trader-2:     we will put it in tonmorrow morning and
>               no one will touch it i promise you.

The next day, RBS increased its 3-month Yen LIBOR submission by three basis points, making it the second-highest submission, and increased its 6-month submission by five basis points, making it the third-highest submission.

27.     On at least one occasion, an RBS Yen derivatives trader recognized that it might be necessary to have an excuse for manipulating RBS's Yen LIBOR contributions that day.  On August 28, 2008, Trader-2 asked Trader-1, "where shall we put libors."  Trader-1 responded, "high 3m … low 6m."  They then discussed the 1-month LIBOR submission.  Trader 2 said, "1s?",

---

[10] This acronym refers to the British Pound.

to which Trader-1 responded: "low . . . so we dont need to change 1 today . . . pretend we forgot . . .we can change it tomorrow . . . assuming no one else in bank has any position in 1s." RBS kept its 1-month Yen LIBOR submission unchanged that day, tying it for the third lowest of all Contributor Panel banks. And, consistent with Trader-1's request, RBS's 3-month Yen LIBOR submission increased by two basis points, and its 6-month Yen LIBOR submission declined by one basis point.

28. Trader-1 and Trader-2 on occasion passed their requests to Submitter-1 for LIBOR contribution levels through a junior derivatives trader, Trader-5, who worked on the Yen desk in London under Trader 2. For example, on April 24, 2009, Trader-5 asked Submitter-1, "Can we go with high 3s and high 6s plz today." Submitter-1 responded, "they are lookingh bit softer , but will try and keep ours unch."[11] Trader-5 responded, "thnx." RBS's 3-month and 6-month Yen LIBOR submissions on that day were unchanged from the day before, and both were above the actual LIBOR fix.

29. On another occasion, in an electronic chat on September 23, 2009, Trader-1 said to Trader-5, "hey… can you ask [Submitter-1] if he can lower his 3mth Libor by 1 bp today? and everything else unchange." Trader-5 responded, "yes," then

---

[11] In the context of the RBS chats, "unch" appears to mean that the LIBOR would be unchanged from the previous day.

14

"asking," and finally, "agreed." On that day, RBS lowered its 3-month Yen LIBOR submission one basis point compared to the previous day.

30. On another occasion, on April 22, 2009, Trader-2 asked Submitter-1 in an electronic chat, "can we push up 6m again pls?" Submitter-1 responded, "ok will try." Trader-2 then asked, "what do you think we can go for?," to which Submitter-1 responded, "77." That day, RBS's 6-month Yen LIBOR submission increased by one basis point to 0.77, making RBS the highest submitter among the eight banks included in that day's LIBOR fixing. RBS also had increased this submission one basis point on the previous day.

31. Requests for favorable Yen LIBOR submissions were often treated in a routine, even casual, manner. One example is a May 20, 2009 exchange in an electronic chat involving Trader-2 and Submitter-1, among others:

> Trader-2:      high 3s and low 6s pls [Submitter-1]
>
> Submitter-1:   no problems
>
> Trader-2:      grazias amigo . . . where will you
>                lower 6s to?
>
> Submitter-1:   70

RBS's 6-month Yen LIBOR submission on May 20 dropped two basis points from 0.72 (where it had been the preceding two days) to 0.70, and on the following two days it reverted to 0.72.

15

32.    A second example is an electronic chat dated September 15, 2009, in which Trader-2 asked, "can we lower our fixings today please [Submitter-1]."  Submitter-1 responded, "make your mind up," then "haha , yes no probs."  Trader-2 stated, "im like a whores drawers."  RBS lowered its 3-month and 6-month Yen LIBOR submissions on that day, and kept its 1-month submission the same.

33.    The requests from Trader-1 and Trader-2 continued throughout 2010.  For example, on July 20, 2010, Trader-1, in an electronic chat with Trader-2, asked, "can you ask [Submitter-1] to set 6m JPY higher today? 45 would be good.."  Trader-2 responded, "yes i did" and "he will bump it up a point."  On that day, RBS's 6-month Yen LIBOR submission increased from 0.44 to 0.45.

34.    By at least September 2010, certain RBS Yen derivatives traders became aware of a prohibition on communicating about requests for LIBOR submissions.  On September 24, 2010, in an electronic chat involving Trader-1, Trader-2, and Trader-5, among others, Trader-1 initiated a request by stating, "hey [Trader-2], can you ask [Submitter-1] to push 6m JPY Libor up 2 bps to 44."  Trader-2 responded, "ha . . . i will mention it . . . no emails anymore . . . after tom[12]."

---

[12] The context of the remainder of the electronic chat suggests this is a reference to Tom Hayes.

Trader-1 replied, "haha…i heard he called up BBA to ask them to change the way they fix the libor."

35. A month later, on October 28, 2010, Trader-1, in an electronic chat with Trader-2, indicated that he would make his request orally rather than in an electronic communication:

> Trader-1: it would help if [Submitter-1] hike up 1 bp today
>
> Trader-2: i try, after the tomhayes thing its more difficult . . . i feel the more i ask the more he wont . . . out of principal
>
> Trader-1: true
>
> Trader-2: cos i cant type it on chat anymore . . . i have to walk over

36. In a November 22, 2010, electronic chat, Trader-1 and Trader-2 discussed their view that they should take over submitting Yen LIBOR on behalf of RBS:

> Trader-1: actually we shd just take over the libor setting
>
> Trader-2: hahaha
>
> Trader-1: doesnt make sense for him [Submitter-1] cuz he doesnt have any risk
>
> Trader-2: i agree

17

Trader-1:      [A manager in Singapore] question today why [Submitter-1] sets it when he doesnt even have any risk

Trader-2:      but libor i guess technically isnt meant to be set by risk takers

Trader-1:      yes but why give it away the advantage?

37. Earlier in that same electronic chat, Trader-1 and Trader-2 indicated they were aware that LIBOR was coming under scrutiny, yet they continued to discuss how Yen LIBOR levels could be manipulated for their benefit:

Trader-1:      hey … you think we be able to convince [Submitter-1] to change the libor today?

Trader-2:      i can try

Trader-1:      need to drop 3mth Libor and hike 6m Libor

Trader-1:      he dropped 6m by 2 bps last friday

Trader-2:      at the moment the FED are all over us about libors

Trader-1:      thats for the USD?

Trader-2:      yers

Trader-1:      dun think anyone cares the JPY libor

Trader-2:      not yet

38.     In 2010, after RBS began an investigation into certain
LIBOR reporting practices in response to inquiries from
governmental authorities, the head of money market trading in
London instructed other money market traders that they were not
to accept requests for LIBOR submissions from derivatives
traders.  Nonetheless, on November 24, 2010, after Trader 1 sent
an electronic message to Submitter-1 asking to increase the 6-
month submission to suit a trading position, Submitter-1 called
Trader-1 and stated that "we are not allowed to have those
conversations on Mindalign."[13]   Trader-1 referenced "the BBA
thing," after which Submitter-1 stated, "leave it with me and,
uh, it won't be a problem. . ."   Trader-1 responded, "ok,
great."

39.     From late 2006 until, in some instances, mid-2009, RBS
combined the short-term interest rate desks and money markets
desks such that derivatives traders and money market traders
(including LIBOR submitters) in London generally sat together by
currency teams.  This facilitated greater communication between
derivatives traders and money market traders, and, among other
things, made it easier for some derivatives traders to request
LIBOR submissions because they were in closer physical proximity
to Submitter-1.  During this period of time, some Yen

---

[13] Mindalign was an internal RBS electronic chat system.

derivatives traders seated near Submitter-1 made oral requests to him for favorable LIBOR submissions.

2)    The Role of RBS Management

40.   At least two RBS managers[14] were aware of significant conflicts of interest with derivatives traders acting as backup LIBOR submitters.  Moreover, one of these managers was aware of, and at times participated in, the manipulation of the RBS Yen LIBOR submissions by derivatives traders as described above.

41.   For example, on August 22, 2007, Manager-1[15] became aware that Trader-2, who was acting as a backup Yen LIBOR submitter that day, made RBS's submission for his own benefit. Manager-1 asked, "Hi Mate, where are u calling the 6m and 3s Libor today?"  Trader-2 responded, "i put in 1.05 and 1.15." Manager-1 said "ok cool. . . is that close to consensus?," to which Trader-2 responded, "i think my 3s are too high . . . 6s will prob be 1.13 too . . . but i wanted high fixes today." Later, Trader-2 asked, "well let me know if you have any preferencves . . . each day."  Manager-1 responded, "thx will do."

42.   Later, in an electronic chat on December 3, 2007, Manager-1 communicated his own requests for the direction of

_____

[14] The term "manager," as used herein, does not include members of the board of directors, executive board, or executive management.

[15] This manager was employed by RBSSJ at this time.

LIBOR to Trader-3, with whom he shared a Yen trading book. Manager-1 said to Trader-3, "for choice we want lower libors... let the MM guys know pls." Trader-3 responded that he was serving as the submitter that day "as [Trader-2] and cash guy off." Manager-1 then said "great. . . set it nice and low." Trader-3 suggested 1.02 "or lower" for the 6-month Yen LIBOR submission, to which Manager-1 responded, "yeh lower." Trader-3 indicated that he could go down one more basis point to 1.01, which he did – making RBS the lowest of all Contributor Panel banks whose LIBOR submissions were counted in that day's fixing.

### 3) *Interbank Coordination of Rate Submissions*

43. At least as early as February 2007, an RBS derivatives trader, Trader-3, and Tom Alexander William Hayes ("Hayes"),[16] a derivatives trader at a Japanese subsidiary of another Yen LIBOR Contributor Panel bank, UBS AG ("UBS"), agreed to request that their respective Yen LIBOR submitters contribute Yen LIBOR submissions to benefit their trading positions. In 2008, Hayes and another RBS trader, Trader-6, agreed to make requests to benefit Hayes's trading positions, and, in 2010, after Trader-6 had left RBS and moved to an interdealer broker,[17] Hayes enlisted

---

[16] Hayes had previously been employed at RBS as a Yen derivatives trader.

[17] Interdealer Brokers track bids and offers of cash in the market and assist derivatives and money market traders in arranging transactions between financial institutions and other market participants.

Trader-6 to convey requests to RBS for the purpose of
influencing RBS's Yen LIBOR submissions.

44.   As early as February 2, 2007, Trader-3 knew that Hayes
communicated with another Contributor Panel bank, Bank-A, as
part of Hayes's effort to manipulate Yen LIBOR.   In an
electronic chat that day, Hayes stated:

> Hayes:          . . . 3m libor is too high cause i have
>                 kept it artificially high.
>
> Trader-3:       how
>
> Hayes:          being mates with the cash desks, [Bank-
>                 A] and i always help each other out . .
>                 . too.
>
> Trader-3:       ok thats useful to know. . .

45.   On numerous occasions in 2007, Hayes requested that
Trader-3 ask the RBS Yen LIBOR submitter to move RBS's LIBOR
submission in a particular direction (i.e., up or down) or to
contribute a particular LIBOR submission in order to benefit
Hayes's trading positions.   Trader-3 often agreed to make the
request.   On a few occasions, Trader-3 similarly requested that
Hayes ask UBS's Yen LIBOR submitter to make a contribution that
would benefit Trader-3's trading positions, and Hayes agreed to
make the requests.

46.   For example, over a period of approximately ten days
in February 2007, Hayes and Trader-3 discussed lowering the 1-

month Yen LIBOR to benefit their trading positions, in addition
to coordinating requests in other tenors.  In an electronic chat
on February 8, 2007, Hayes requested that Trader-3 ask RBS's Yen
LIBOR submitter to contribute a low 1-month Yen LIBOR
submission:

> Hayes:      can you do me a huge favour, can you
>             ask your cash guys to set 1m libor low
>             for the next few days . . . i'll return
>             the favour as when you need it . . . as
>             long as it doesn't go against your
>             fixes . . . have 30m jpy of fixes over
>             the next few days
>
> Trader-3:   yeah i will try

Later in the same chat, Hayes noted that he "lost lots today. .
. hence really need a hand on 1m lib . . . pls don't forget."
Trader-3 responded, "ok i will try my best."  Trader-3 and Hayes
then discussed other topics, and at the end of the conversation,
Hayes reminded Trader-3 of his request for a low 1-month Yen
LIBOR:

> Hayes:      oh well i am off home dreaming of a low
>             1m libor!
>
> Trader-3:   good luck what sort fo level do u want
>
> Hayes:      if you can get a .42 six that wd be
>             great . . . fix . . . not six

23

<pre>
Trader-3:        0.42

Hayes:           thats the one!

Trader-3:        ok will speak to me guy in a sec
</pre>

47. The next day, in an electronic chat dated February 9, 2007, Hayes thanked Trader-3. The two traders discussed whether their trading positions, and thus their preferred Yen LIBOR levels, were aligned, and Hayes requested a low fixing:

<pre>
Hayes:           thx help 1m y/day appreciated

Trader-3:        no worries

                 *  *  *  *

Hayes:           can you ask for a low 1m again today
                 pls if ok? . . . todays fix is 12m . .
                 . you need anything on 3m or 6m?

Trader-3:        no my book is still tiny i will go for
                 low libor again . . . it suits me too
                 as i am short the spreads

Hayes:           ok thanks
</pre>

48. Later in the same chat, Trader-3 and Hayes discussed their mutual interest in low 1-month and other Yen LIBOR submissions, and Hayes told Trader-3 that he would contact Bank-A as well:

<pre>
Trader-3:        i told my cash guy i want low 1m and 3m
                 fixes and high 6 m that suits uu right
                 ??
</pre>

Hayes:          yes absolutely, is that ok with you? we

                will be exactly the same . . . am going

                to talk to [Bank-A] as well

Trader-3:       perfect

Hayes:          cool . . . you in monday?

Trader-3:       yeah a bit

Hayes:          ok get them to set the same fixes

                monday as well if ok

Trader-3:       sure

49.   On February 13 and 14, 2007, Hayes again requested
that Trader-3 ask RBS's Yen LIBOR submitter for a low 1-month
Yen LIBOR contribution, and informed Trader-3 that Hayes would
continue to need a low 1-month Yen LIBOR until February 15,
2007.

50.   In an electronic chat on February 15, 2007, Hayes
requested that Trader-3 make a request to the RBS Yen LIBOR
submitter for low 1-month and high 6-month submissions, and
Trader-3 agreed to do so:

                Hayes:          can you ask for a low 1m fix again . .

                                . wd really help

                        *  *  *  *

                Trader-3:       sure it suite me to get low 1s and s .

                                . . 3s

| Hayes: | thanks need high 6's tho if ok with you? |
| | * * * * |
| Trader-3: | i have got nothing in 6s until the 19 fix date when i need a high one too |
| Hayes: | ok thx [Trader-3] |
| Trader-3: | so yeah thats fine with me my cash guy is rubbish at guessing where libors are going to be but he listens to what i say |
| Hayes: | thats a releif |

51.  Later that same day, Trader-3 asked Hayes "how many people can you get to put this 1m libor low." Hayes responded, "well us [Bank-A] and a few others i think."

52.  Within minutes of this exchange, Hayes asked a UBS Yen LIBOR submitter to contribute a low 1-month and 6-month Yen LIBOR submission.[18] Hayes then asked the UBS submitter if he knew anyone at another Contributor Panel bank that he "could have a word with . . . as a favour." The submitter replied that he lacked that "edge" but suggested that Hayes "have a word with [Bank-A]." In response, Hayes stated that he had "already done that . . . and rbs."

---

[18] RBS acknowledges that the government possesses evidence that would prove the contents of this communication.

26

53. Hayes occasionally communicated to Trader-3 his expectations about the direction of an upcoming UBS LIBOR submission. In an electronic chat on February 26, 2007, for example, Hayes asked, "can you try to get your guys to leave their 3m and 1m libors unchanged." Trader-3 responded, "yeah i want low ones so that suits me." Hayes replied by communicating UBS's intention: "gd thx mate . . . we are going low too."

54. On a few occasions, Trader-3 also requested that Hayes ask the UBS Yen LIBOR submitter to contribute a particular submission or to move UBS's submission in a particular direction (i.e., up or down) in order to benefit Trader-3's trading positions, and Hayes agreed. In an electronic chat on March 2, 2007, the following exchange occurred:

> Trader-3:     please please low 6m fix on monday . .
>               . i have got a ig fix
>
> Hayes:        sure no worries
>
>               * * * *
>
> Hayes:        how big is the fix mate?
>
> Trader-3:     100 us big for me
>
> Hayes:        10m jpy? . . . yes thats quite lrge
>               200b 6m

55. On March 6, 2007, Trader-3 had the following exchange with Hayes in an electronic chat:

> Trader-3:       yeah can u go fr low everything plse .
>                 . . i am
>
> Hayes:          will do cld do with high threes but
>                 won't get it we are the lowest

Later that morning, consistent with the request he received from Trader-3, Hayes had the following exchange with UBS's Yen LIBOR submitter:[19]

> Hayes:          hi pls don't forget low 1m and 6m!   :)
>                 . . . have lots fixing
>
> UBS submitter:  mate i won't

56.     On a few occasions, Trader-3 reported back to Hayes that he expected Submitter-1 to accommodate a request.  In an electronic chat on April 20, 2007, Hayes requested that Trader-3 ask RBS's Yen LIBOR submitter for a low 3m Yen LIBOR submission:

> Hayes:          . . . if you could ask your guys to
>                 keep 3m low wd be massive help as long
>                 as it doesn't interfere with your stuff
>                 . . . tx in adavance.

Approximately 30 minutes later, Hayes and Trader-3 had the following exchange:

> Hayes:          mate did you manage to spk to your cash
>                 boys?

---

[19] RBS acknowledges that the government possesses evidence that would prove the contents of this communication.

Trader-3:      yes u owe me they are going 65 and 71

Hayes:         thx mate yes i do . . . in fact i owe

               you big time

Approximately 45 minutes later, Hayes sent the following message
to Trader-3:

Hayes:         mater they set 64! . . . thats beyond

               the call of duty!

               *  *  *  *

Trader-3:      no worries

57.   Hayes' requests to Trader-3 continued at various times
throughout 2007.  In an electronic chat on November 1, 2007, for
example, Hayes and Trader-3 had the following  exchange:

Hayes:         hello mate, real big favour to ask. . .

               could you try for low 6m fix today pls

               wld be most appreciated

               thx mate

Trader-3:      will try my best dude hows u??

Hayes:         ok, trading like an idiot today, to be

               honest just want to take some risk off

               my book before i come back in dec, have

               had ok year but management still

               pushing me for more, have huge 6m fix

               so if you could help out today would

> really really really appreciate it!
>
> how are you?

58.  Trader-3's dealings with Hayes were noted by others at
RBS.  In an electronic chat on March 27, 2008, Trader-1 asked
Trader-2 whether Trader-3's request for a lower submission was
done at Hayes's request:

> Trader-1:   we change the libor lower?
>
> Trader-2:   [Trader-3] asked [a junior backup
>             submitter] to put it low

    *  *  *  *

> Trader-1:   does he need it or Tom Hayes ask him to
>             do it? . . . cos UBS wanted low

59.  During 2008, Hayes, as he had with Trader-3, asked
Trader-6 to request that RBS's Yen LIBOR submitter contribute
RBS's Yen LIBOR submissions at levels that benefitted Hayes's
trading positions.

60.  Trader-6 and Hayes had the following exchange by email
on May 7, 2008:

> Hayes:   Hi [Trader-6] . . . can you please ask
>          for a low 6m in jpy for the next few
>          days. Hope you are ok, was good seeing
>          you last week

>Trader-6: Hi mate, I mentioned it to our guy on Friday and he seemed to have no problem with it, so fingers crossed.

61. A similar electronic communication occurred on November 3, 2008:

>Hayes: can you do me a favour and ask your guys for a low JPY 3m fix today if they can? . . . wld be massiive help
>
>Trader-6: will ask
>
>Hayes: have monster fix . . . thanks[Trader-6]

62. In or around July 2009, Trader-6 left RBS, and subsequently began working for an interdealer brokerage firm ("Brokerage-A") as a cash broker. While at Brokerage-A, Trader-6 maintained his relationship with Submitter-1 at RBS, and continued to assist Hayes in Hayes's efforts to influence RBS's Yen LIBOR submissions.

63. For instance, on March 3, 2010, Hayes (who by that time had left UBS and joined Bank-B) had the following exchange with Trader-6, who was now employed as a broker with Brokerage-A:[20]

---

[20] RBS acknowledges that the government possesses evidence that would prove the contents of this communication.

| Hayes: | i really need a low 3m jpy libor into the imm[21] . . . any favours you can get with [Submitter-1] would be much appreciated . . . even if he on;ly move 3m down 1bp . . . from 25 to 24 |
| Trader-6: | i'll give him a nudge later, see what he can do |
| Hayes: | thanks mate . . . really really would appreciate that |
| Trader-6: | haven't seen him since i left so I might buy him a steak to catch up |
| Hayes: | yeah |

A little less than three hours later, Trader-6 and Submitter-1 had the following conversation:

| Trader-6: | can i pick ur brain? |
| Submitter-1: | yeah |
| Trader-6: | u see 3m jpy libor going anywhere btween now and imm? |
| Submitter-1: | looks fairly static to be honest , poss more pressure on the upside , but not alot |

---

[21] This refers to an International Monetary Market (IMM) settlement date, which is the third Wednesday of March, June, September, and December. Most futures and options contracts set their maturity or termination dates at the IMM settlement dates.

Trader-6: oh. we hve a mutual friend who'd love
to see it go down, no chance at all?

Submitter-1: haha TH[22] by chance

Trader-6: shhh

Submitter-1: hehehe , mine should remain flat ,
always suits me if anything to go lower
as i rcve funds

Trader-6: gotcha, thanks, and, if u cud see ur
way to a small drop there might be a
steak in it for ya, haha

Submitter-1: noted ;-)

64. The next day, March 4, 2010, RBS's Yen LIBOR
submission moved down by one basis point, from 25 to 24,
consistent with Hayes's request, prompting the following
exchange between Trader-6 and Submitter-1:

Submitter-1: Libor lower ;-)

Trader-6: good work!!!!

65. Submitter-1 lowered RBS's Yen LIBOR contribution
another basis point on March 9, 2010, then dropped it another
basis point two days later, tying one other Contributor Panel
bank for the lowest Yen LIBOR submission that day. RBS's Yen
LIBOR submission remained tied with one other Contributor Panel
bank submission through March 17, 2010, the March IMM fixing

---

[22] The context indicates the reference was to Tom Hayes.

33

date originally referenced by Hayes. On March 17, 2010, RBS's Yen LIBOR submission was 2.375 basis points below the BBA Yen LIBOR fix.[23]

B. *Swiss Franc LIBOR*

66. On numerous occasions beginning in approximately 2007 and continuing until at least 2009, London-based Swiss Franc derivatives traders asked the Swiss Franc LIBOR submitters to contribute LIBOR submissions to benefit their trading books of derivatives tied to Swiss Franc LIBOR. The RBS Swiss Franc LIBOR submitters agreed to accommodate many of these requests.

67. For example, on December 4, 2008, Trader-7, the principal RBS Swiss Franc derivatives trader based in London, asked Submitter-1 (who was primarily responsible for Swiss Franc LIBOR submissions as well as Yen LIBOR submissions), "can u put 6m swiss libor in low pls?" After some back-and-forth,

---

[23] In addition to the conduct described above, an RBS derivatives trader, on a few occasions from September 2007 to mid-2008, attempted to coordinate with derivatives traders at other banks about submissions related to the Euro Interbank Offered Rate ("EURIBOR"), a reference rate overseen by the European Banking Federation. RBS became a Contributor Panel Bank for EURIBOR in October 2007 by virtue of its acquisition of ABN AMRO Bank. For example, in a series of instant messages on October 4, 2007, the RBS derivatives trader who traded products tied to EURIBOR, communicated with two derivatives traders employed by Barclays Bank, plc regarding favorable EURIBOR settings for their trading positions. The Barclays Bank traders agreed to the RBS trader's request and shared their intended submissions in other tenors, to which the RBS trader signaled approval.

Submitter-1 agreed to the request, saying "ok low 6m, just for u." Trader-7's response was "wooooooohooooooo."

68.  Trader-7's requests were often very insistent. On one occasion, on January 30, 2009, Trader-7 asked Submitter-1 for "high 3m libors pls!!!!!!" Submitter-1 asked, "0.50??...0.51…0.52…0.53[.]" Trader-7 then messaged "0.54" eight times. He followed this with a request for "low 6m," and four separate messages in a row saying "0.65." Submitter-1 responded "ok…libors as requested," and Trader-7 closed out the conversation by saying "you a top dog."

69.  Trader-7 sent a similar message approximately two months later, on May 5, 2009, asking Submitter-1, "can we get high 3m, low 6m pls!" Submitter-1 responded, "maybe," and Trader-7 begged, "PPPPLLLLLEEEEEAAAAASSSSEEEEEE." Submitter-1 responded simply "ok," and set out proposed LIBOR levels. Trader-7 pronounced them "perfect" twice.

70.  Trader-7, like the Yen derivatives traders, sought changes in LIBOR to benefit his own trading book. On March 16, 2009, for example, Trader-7 asked Submitter-1, "can we pls get a very very very low 3m and 6m fix today pls." He explained in his next posting, "we have rather large fixings!" Submitter-1 responded, "perfect, if thats what u want." Trader-7 also extended his request to the next day: "and then from tomorrow . . . we need them thru the roof!!!!!"

71.    Frequently, in asking Submitter-1 to accommodate his
LIBOR manipulation requests, Trader-7 bantered with Submitter-1,
suggesting the routine nature of such requests.  For example, on
May 14, 2009, Trader-7 and Submitter-1 joked about manipulating
the RBS Swiss Franc LIBOR submission:

> Trader-7:      pls can we get
>
> Trader-7:      super high 3m
>
> Trader-7:      super low 6m
>
> Trader-7:      PRETTY PLEASE!
>
> Submitter-1:   41 & 51
>
> Trader-7:      if u did that
>
> Trader-7:      i would lvoe u forever
>
> Submitter-1:   41 & 51 then . . .
>
> Trader-7:      if u did that i would come over there
>
>                and make love to you
>
> Trader-7:      your choice
>
> Submitter-1:   41+51 it is
>
> Trader-7:      thouht so
>
> Submitter-1:   so shallow

72.    A junior Swiss Franc derivatives trader (Trader-8),
who worked under Trader-7, also requested favorable LIBOR
submissions.  On March 2, 2009, Trader-8, in an electronic chat
that consisted of at least himself, Trader-7 and Submitter-1,
stated, "can you fix 3mth libor high as possible today, thanks."

73.    Likewise, a junior money market trader in the Swiss

Franc, who also served as a backup submitter in that currency,

accommodated several requests to alter RBS's LIBOR

contributions.    For example, on April 9, 2009, Trader-7, in an

electronic chat with at least this submitter, asked, "can we go

41 and 52 today pls guys?"    The submitter responded, "sure

guys," and shortly thereafter said, "thats in."

74.    In addition to requests via electronic chat, on many

occasions between 2007 and 2009, a Swiss Franc derivatives

trader in London made oral requests to Submitter-1 for LIBOR

submissions that would benefit his/her trading book.

C.    Implications of Traders' Requests

75.    When RBS's Yen LIBOR and Swiss Franc LIBOR derivatives

traders made requests of RBS's LIBOR rate submitters in order to

influence RBS's benchmark interest rate submissions, and when

the submitters accommodated those requests, the manipulation of

the submissions affected the fixed benchmark rates on various

occasions.

76.    Likewise, when traders, former traders, and/or

submitters, including some at RBS, agreed to coordinate requests

for favorable Yen LIBOR submissions, and when LIBOR submitters

accommodated those requests, the manipulation of submissions

affected the fixed benchmark rates on various occasions.

77.    Indeed, the purpose of these activities was to manipulate interest rate submissions in order to influence the resulting fixes and thus to have a favorable effect on the derivatives traders' trading positions.  Because traders' compensation was based in part on the profit and loss calculation of the trading books, derivatives traders' requests were intended to benefit their compensation as well.

78.    Because of the high value of the notional amounts underlying derivatives transactions tied to Yen and Swiss Franc LIBOR, even very small movements in those rates could have a significant positive impact on the profitability of traders' trading portfolios, and a correspondingly negative impact on their counterparties' trading positions.

79.    RBS entered into interest rate derivatives transactions tied to Yen and Swiss Franc LIBOR - such as swaps and forward rate agreements - with various counterparties, some of which were located in the United States.  United States counterparties included banks and other financial institutions in the United States or located abroad with branches in the United States.  Those counterparties also included, among others, asset management corporations, business corporations, insurance companies, universities, and non-profit organizations.

80.    In the instances when the published benchmark interest rates were manipulated in RBS's favor due to RBS's manipulation

of its own or, in conjunction with another Contributor Panel bank, that bank's submissions, that manipulation benefitted RBS derivatives traders, or minimized their losses, to the detriment of counterparties, at least with respect to the particular transactions comprising the trading positions that the traders took into account in making their requests to the rate submitters. RBS derivatives traders and rate submitters who tried to manipulate LIBOR submissions understood the features of the derivatives products tied to these benchmark interest rates; accordingly, they understood that to the extent they increased their profits or decreased their losses in certain transactions from their efforts to manipulate rates, their counterparties would suffer corresponding adverse financial consequences with respect to those particular transactions.

81. When the requests of derivatives traders for favorable LIBOR submissions influenced the RBS rate submitters' contributions, RBS's rate submissions were false and misleading. In making and in accommodating these requests, the derivatives traders and submitters were engaged in a deceptive course of conduct in an effort to gain an advantage over their counterparties. As part of that effort: (1) derivatives traders and submitters submitted, and caused the submission of, materially false and misleading LIBOR contributions; and (2) derivatives traders, after initiating and while continuing their

effort to manipulate LIBOR contributions, negotiated and entered into derivatives transactions with counterparties knowing that that those counterparties were unaware of the efforts by RBS employees to manipulate the relevant LIBOR rate.

82. Traders, former traders, and/or submitters at competing financial institutions, including RBS, agreed to coordinate and in fact coordinated with regard to Yen LIBOR submissions, causing the manipulation of the LIBOR reference rate on certain occasions. Because Yen LIBOR was a pricing component of derivatives contracts held by the financial institutions, the traders benefited from this agreement by affecting the profitability of the contracts on particular settlement dates.

### III.

### RBS's ACCOUNTABILITY

83. RBS acknowledges that the wrongful acts taken by the participating employees in furtherance of the misconduct set forth above were within the scope of their employment at RBS. RBS acknowledges that the participating employees intended, at least in part, to benefit RBS through the actions described above. RBS acknowledges that due to this misconduct, RBS, including the RBS branches or agencies in the United States, have been exposed to substantial financial risk, and partly as a result of the penalties imposed by this Deferred Prosecution

Agreement and under agreements reached with other government authorities, has suffered actual financial loss.

ATTACHMENT B

**<u>EXTRACT OF BOARD RESOLUTION</u>**

# ✕✕RBS Group

EXTRACT DRAFT MINUTES of Meeting of the Board of Directors of THE ROYAL BANK OF SCOTLAND PLC (the "Bank") held by telephone on Monday, 4 February 2013

Project Silo

The Directors having considered:

1.   the terms of the proposed settlement agreement between the Bank and the United Kingdom Financial Services Authority ("FSA") as circulated to the Board on 1 February 2013 (the "Settlement Agreement");

2.   the advice to the Board from its legal counsel regarding the terms of the Settlement Agreement.

3.   the discussions between the Bank, through its legal counsel, and the United States Department of Justice, Criminal Division, Fraud Section, and the Antitrust Division (together, the "DOJ") regarding issues arising in relation to the manipulation, attempted manipulation, and interbank coordination of benchmark interest rate submissions;

4.   the terms of the proposed deferred prosecution agreement with the DOJ as circulated to the Board on 3 February 2013 (the "DPA"); and

5.   the advice to the Board from its legal counsel regarding the terms of the DPA, as well as the advice regarding the waiver of rights and other consequences of entering into such an agreement with the DOJ.

Resolved that:

1.   the terms of the Settlement Agreement are accepted on behalf of the Bank;

2.   the Chairman, Mr Hester, Mr Van Saun or the General Counsel are duly authorised to execute and deliver the Settlement Agreement substantially in the form as reviewed by the Board of Directors on behalf of the Bank, and to execute and sign all such other documents and instruments and take all such other steps as such Director or General Counsel may deem necessary in order to conclude the investigations by the FSA of the Bank according to such terms.

3.   the Bank (a) acknowledges the filing of the two-count Information charging the Company with one count of wire fraud, in violation of Title 18, United States Code, Section 1343, and one count of price-fixing in violation of the Sherman Act, Title 15, United States Code, Section 1; (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Department; and (c) agrees to accept monetary criminal penalties against RBS totaling $150,000,000, and to pay a total of $150,000,000 to the United States Treasury with respect to the conduct described in the Information;

4.   the Chairman, Mr Hester, Mr Van Saun or the General Counsel are hereby authorised, empowered and directed, on behalf of the Bank, to execute the DPA substantially in such form as reviewed by this Board of Directors at this

meeting with such changes as any two of the Chairman, Mr Hester, Mr Van Saun or the General Counsel may approve;

5.    the Chairman, Mr Hester, Mr Van Saun or the General Counsel are hereby authorised, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

6.    all of the actions of the Chairman, Mr Hester, Mr Van Saun or the General Counsel which actions would have been authorised by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Bank.

I confirm the foregoing resolutions were passed by The Royal Bank of Scotland Plc Board on 4 February 2013

Aileen Taylor
Group Secretary
5 February 2013

# ✗✗ RBS Group

EXTRACT DRAFT MINUTES of Meeting of the Board of Directors of THE ROYAL BANK OF SCOTLAND PLC (the "Bank") held by telephone on Monday, 4 February 2013

Project Silo

The Directors having considered:

1.  the terms of the proposed settlement agreement between the Bank and the United Kingdom Financial Services Authority ("FSA") as circulated to the Board on 1 February 2013 (the "Settlement Agreement");
2.  the advice to the Board from its legal counsel regarding the terms of the Settlement Agreement.
3.  the discussions between the Bank, through its legal counsel, and the United States Department of Justice, Criminal Division, Fraud Section, and the Antitrust Division (together, the "DOJ") regarding issues arising in relation to the manipulation, attempted manipulation, and interbank coordination of benchmark interest rate submissions;
4.  the terms of the proposed deferred prosecution agreement with the DOJ as circulated to the Board on 3 February 2013 (the "DPA"); and
5.  the advice to the Board from its legal counsel regarding the terms of the DPA, as well as the advice regarding the waiver of rights and other consequences of entering into such an agreement with the DOJ.

Resolved that:

1.  the terms of the Settlement Agreement are accepted on behalf of the Bank;
2.  the Chairman, Mr Hester, Mr Van Saun or the General Counsel are duly authorised to execute and deliver the Settlement Agreement substantially in the form as reviewed by the Board of Directors on behalf of the Bank, and to execute and sign all such other documents and instruments and take all such other steps as such Director or General Counsel may deem necessary in order to conclude the investigations by the FSA of the Bank according to such terms.
3.  the Bank (a) acknowledges the filing of the two-count Information charging the Company with one count of wire fraud, in violation of Title 18, United States Code, Section 1343, and one count of price-fixing in violation of the Sherman Act, Title 15, United States Code, Section 1; (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Department; and (c) agrees to accept monetary criminal penalties against RBS totaling $150,000,000, and to pay a total of $150,000,000 to the United States Treasury with respect to the conduct described in the Information;
4.  the Chairman, Mr Hester, Mr Van Saun or the General Counsel are hereby authorised, empowered and directed, on behalf of the Bank, to execute the DPA substantially in such form as reviewed by this Board of Directors at this

meeting with such changes as any two of the Chairman, Mr Hester, Mr Van Saun or the General Counsel may approve;

5.   the Chairman, Mr Hester, Mr Van Saun or the General Counsel are hereby authorised, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

6.   all of the actions of the Chairman, Mr Hester, Mr Van Saun or the General Counsel which actions would have been authorised by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Bank.


I confirm the foregoing resolutions were passed by The Royal Bank of Scotland Plc Board on 4 February 2013

Aileen Taylor
Group Secretary
5 February 2013

ATTACHMENT  C

CONFIDENTIAL DOCUMENT REMOVED FROM PUBLIC FILING

PURSUANT TO FOOTNOTE 1 OF THE DEFERRED PROSECUTION AGREEMENT

# ATTACHMENT D

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - -  x

UNITED STATES OF AMERICA,                    :

                Plaintiff,       :     CRIMINAL NO. 3:13CR74(MPS)

      - v. -                                 :

RBS SECURITIES JAPAN LIMITED,         :

            Defendant.        :

- - - - - - - - - - - - - - - - - -  x

**PLEA AGREEMENT**

The United States of America, by and through the Fraud
Section of the Criminal Division ("Fraud Section") and the Antitrust
Division of the United States Department of Justice (together, the
"Department"), and RBS SECURITIES JAPAN LIMITED ("defendant" or "RBS
Securities Japan"), by and through its undersigned attorneys, and
through its authorized representative, pursuant to authority granted
by RBS Securities Japan's Board of Directors, hereby submit and
enter into this plea agreement (the "Agreement"), pursuant to Rule
11(c)(1)(C) of the Federal Rules of Criminal Procedure.  The terms
and conditions of this Agreement are as follows:

## The Defendant's Agreement

1.     RBS Securities Japan agrees to waive indictment and plead guilty to a one-count criminal Information filed in the District of Connecticut charging RBS Securities Japan with wire fraud, in violation of Title 18, United States Code, Section 1343. RBS Securities Japan further agrees to persist in that plea through sentencing and, as set forth below, to cooperate fully with the Department in its investigation into all matters related to the conduct charged in the Information.

2.     RBS Securities Japan understands and agrees that this Agreement is between the Fraud Section and the Antitrust Division of the Department of Justice and RBS Securities Japan and does not bind any other division or section of the Department of Justice or any other federal, state, or local prosecuting, administrative, or regulatory authority.  Nevertheless, the Department will bring this Agreement and the cooperation of RBS Securities Japan, its direct or indirect affiliates, subsidiaries, and parent corporation, to the attention of other prosecuting authorities or other agencies, if requested by RBS Securities Japan.

3.     RBS Securities Japan agrees that this Agreement will be executed by an authorized corporate representative.  RBS Securities Japan represents that a resolution duly adopted by RBS

Securities Japan's Board of Directors is attached to this Agreement as Exhibit 1 and represents that the signatures on this Agreement by RBS Securities Japan and its counsel are authorized by RBS Securities Japan's Board of Directors, on behalf of RBS Securities Japan.

4.   RBS Securities Japan agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement.

5.   RBS Securities Japan agrees to abide by all terms and obligations of this Agreement as described herein, including, but not limited to, the following:

> (1)   to plead guilty as set forth in this Agreement;
>
> (2)   to abide by all sentencing stipulations contained in this Agreement;
>
> (3)   to appear, through its duly appointed representatives, as ordered for all court appearances, and obey any other court order in this matter;
>
> (4)   to commit no further federal crimes;
>
> (5)   to be truthful at all times with the Court;
>
> (6)   to pay the applicable fine and special assessment; and

3

(7)    to work with its parent corporation, The Royal
Bank of Scotland plc ("RBS"), in fulfilling the
obligations described in the undertakings given
by RBS in connection with resolving
investigations by the Department of Justice, the
U.S. Commodity Futures Trading Commission
("CFTC") (attached to this Agreement as Exhibit
2) and the U.K. Financial Services Authority
("FSA").

6.    RBS Securities Japan agrees that in the event RBS
Securities Japan sells, merges, or transfers all or substantially
all of its business operations as they exist as of the date of this
Agreement, whether such sale(s) is/are structured as a stock or
asset sale, merger, or transfer, RBS Securities Japan shall include
in any contract for sale, merger, or transfer a provision fully
binding the purchaser(s) or any successor(s) in interest thereto to
the obligations described in this Agreement.

7.    RBS Securities Japan agrees to continue to cooperate
fully with the Department, the Federal Bureau of Investigation (the
"FBI"), and any other law enforcement or government agency
designated by the Department in a manner consistent with applicable
law and regulations.  At the request of the Department, RBS

4

Securities Japan shall also cooperate fully with foreign law enforcement authorities and agencies. RBS Securities Japan shall, to the extent consistent with the foregoing, truthfully disclose to the Department all factual information not protected by a valid claim of attorney-client privilege or work product doctrine protection with respect to the activities of RBS Securities Japan and its affiliates, its present and former directors, officers, employees, and agents, between the date of this Agreement and the expiration of the Deferred Prosecution Agreement dated February 6, 2013 between the Department and RBS ("Attachment A" to the "DPA"), in *United States v. The Royal Bank of Scotland plc*, concerning all matters relating to (a) the manipulation, attempted manipulation, or interbank coordination of any benchmark rates, or (b) violations of United States laws concerning fraud or antitrust, or governing securities or commodities markets, about which RBS Securities Japan has any knowledge or about which the Department, the FBI, or any other law enforcement or government agency designated by the Department, or, at the request of the Department, any foreign law enforcement authorities and agencies, shall inquire. This obligation of truthful disclosure includes the obligation of RBS Securities Japan to provide to the Department, upon request, any non-privileged or non-protected document, record, or other tangible

evidence about which the aforementioned authorities and agencies shall inquire of RBS Securities Japan, subject to the direction of the Department.

8.  RBS Securities Japan agrees that any fine or restitution imposed by the Court will be due and payable within ten (10) business days of sentencing, and RBS Securities Japan will not attempt to avoid or delay payments. RBS Securities Japan further agrees to pay the Clerk of the Court for the United States District Court for the District of Connecticut the mandatory special assessment of $400 within ten (10) business days from the date of sentencing.

9.  RBS Securities Japan agrees that if the defendant company, its parent corporation, or any of its direct or indirect affiliates or subsidiaries issues a press release or holds a press conference in connection with this Agreement, RBS Securities Japan shall first consult with the Department to determine whether (a) the text of the release or proposed statements at any press conference are true and accurate with respect to matters between the Department and RBS Securities Japan; and (b) the Department has no objection to the release or statement. Statements at any press conference concerning this matter shall be consistent with such a press release.

## The Department's Agreement

10.    In exchange for the guilty plea of RBS Securities
Japan and the complete fulfillment of all of its obligations under
this Agreement, the Department agrees it will not file additional
criminal charges against RBS Securities Japan relating to (a) any of
the conduct described in the Statement of Facts attached hereto as
Exhibit 3, (b) any of the conduct described in the Statement of
Facts attached as Attachment A to the DPA, or (c) information
disclosed by RBS Securities Japan or RBS to the Department prior to
the date of this Agreement relating to the manipulation, attempted
manipulation, or interbank coordination of benchmark rates,
including those benchmark rates identified in Attachment C to the
DPA.    This paragraph does not provide any protection against
prosecution for manipulation of interest rates, any scheme to
defraud counterparties to interest rate derivatives trades placed on
its behalf, or any antitrust violation in the future by RBS
Securities Japan or by any of its officers, directors, employees, or
agents, whether or not disclosed by RBS Securities Japan pursuant to
the terms of this Agreement.    This Agreement does not close or
preclude the investigation or prosecution of any natural persons,
including any officers, directors, employees, or agents of RBS
Securities Japan, who may have been involved in any of the matters

7

set forth in the Information, Attachment A of the DPA, or in any other matters.

## Factual Basis

11.   RBS Securities Japan is pleading guilty because it is guilty of the charge contained in the Information.  RBS Securities Japan admits, agrees, and stipulates that the factual allegations set forth in the Information are true and correct, that it is responsible for the acts of its present and former officers and employees described in the Statement of Facts attached hereto and incorporated herein as Exhibit 3, and that Exhibit 3 accurately reflects RBS Securities Japan's criminal conduct.  RBS Securities Japan also admits, agrees, and stipulates that Attachment A to the DPA, to the extent that Attachment A describes the conduct of employees of RBS Securities Japan, is true and correct, and that RBS Securities Japan is responsible for such conduct.

## RBS Securities Japan's Waiver of Rights,
## Including the Right to Appeal

12.   Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 limit the admissibility of statements made in the course of plea proceedings or plea discussions in both civil and criminal proceedings, if the guilty plea is later withdrawn.  RBS Securities Japan expressly warrants that it has

discussed these rules with its counsel and understands them. Solely to the extent set forth below, RBS Securities Japan voluntarily waives and gives up the rights enumerated in Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410. Specifically, RBS Securities Japan understands and agrees that any statements that it makes in the course of its guilty plea or in connection with the Agreement are admissible against it for any purpose in any U.S. federal criminal proceeding if, even though the Department has fulfilled all of its obligations under this Agreement and the Court has imposed the agreed-upon sentence, RBS Securities Japan nevertheless withdraws its guilty plea.

13. RBS Securities Japan knowingly, intelligently, and voluntarily waives its right to appeal the conviction in this case. RBS Securities Japan similarly knowingly, intelligently, and voluntarily waives the right to appeal the sentence imposed by the Court. In addition, RBS Securities Japan knowingly, intelligently, and voluntarily waives the right to bring any collateral challenge, including challenges pursuant to Title 28, United States Code, Section 2255, challenging either the conviction, or the sentence imposed in this case, including a claim of ineffective assistance of counsel. RBS Securities Japan waives all defenses based on the statute of limitations and venue with respect to any prosecution

that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) RBS Securities Japan violates this Agreement; or (c) the plea is later withdrawn, provided such prosecution is brought within one year of any such vacation of conviction, violation of agreement, or withdrawal of plea plus the remaining time period of the statute of limitations as of the date that this Agreement is signed. The Department is free to take any position on appeal or any other post-judgment matter.

## Penalty

14.  The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1343, if the violation affects a financial institution, is a fine of $1 million or twice the gross pecuniary gain or gross pecuniary loss resulting from the offense, whichever is greatest, Title 18, United States Code, Section 3571(c)(3),(d); five years' probation, Title 18, United States Code, Section 3561(c)(1); and a mandatory special assessment of $400, Title 18, United States Code, Section 3013(a)(2)(B).

## Sentencing Recommendation

15.  Pursuant to Fed. R. Crim. P. 11(c)(1)(C), the

Department and RBS Securities Japan have agreed to a specific sentence of a fine in the amount of $50,000,000 and a special assessment of $400. The Parties agree that this $50,000,000 fine and the $400 special assessment shall be paid to the Clerk of Court, United States District Court for the District of Connecticut, within ten (10) business days after sentencing. The Department and RBS Securities Japan have agreed that all or a portion of the fine may be paid by one or more related RBS entities, including RBS Securities Japan's parent company, RBS, on behalf of RBS Securities Japan, consistent with RBS policy and practice. RBS Securities Japan acknowledges that no tax deduction may be sought in connection with the payment of this $50,000,000 fine.

16. The parties further agree, with the permission of the Court, to waive the requirement of a Pre-Sentence Investigation report pursuant to Federal Rule of Criminal Procedure 32(c)(1)(A)(ii), based on a finding by the Court that the record contains information sufficient to enable the Court to meaningfully exercise its sentencing power. The parties agree, however, that in the event the Court orders the preparation of a pre-sentence report prior to sentencing, such order will not affect the agreement set forth herein.

17. In the event the Court directs the preparation of

a Pre-Sentence Investigation report, the Department will fully inform the preparer of the pre-sentence report and the Court of the facts and law related to RBS Securities Japan's case. Except as set forth in this Agreement, the parties reserve all other rights to make sentencing recommendations to address questions posed by the Court or the Probation Office and to respond to motions and arguments by the opposing party.

18. This agreement is presented to the Court pursuant to Fed. R. Crim. P. 11(c)(1)(C). RBS Securities Japan understands that, if the Court rejects this Agreement, the Court must: (a) inform the parties that the Court rejects the Agreement; (b) advise RBS Securities Japan's counsel that the Court is not required to follow the Agreement and afford RBS Securities Japan the opportunity to withdraw its plea; and (c) advise RBS Securities Japan that if the plea is not withdrawn, the Court may dispose of the case less favorably toward RBS Securities Japan than the Agreement contemplated. RBS Securities Japan further understands that if the Court refuses to accept any provision of this Agreement, except paragraph 16 above, neither party shall be bound by the provisions of the Agreement.

## Breach of Agreement

19.   RBS Securities Japan agrees that if it breaches this
Agreement, commits any federal crime between the date of this
Agreement and the expiration of the DPA, or has provided or provides
deliberately false, incomplete, or misleading information in
connection with this Agreement, the Department may, in its sole
discretion, characterize such conduct as a breach of this Agreement.
In the event of such a breach, (a) the Department will be free from
its obligations under the Agreement and may take whatever position
it believes appropriate as to the sentence; (b) RBS Securities Japan
will not have the right to withdraw the guilty plea; (c) RBS
Securities Japan shall be fully subject to criminal prosecution for
any other crimes that it has committed or might commit, if any,
including perjury and obstruction of justice; and (d) the Department
will be free to use against RBS Securities Japan, directly and
indirectly, in any criminal or civil proceeding any of the
information or materials provided by RBS Securities Japan pursuant
to this Agreement, as well as the admitted Statement of Facts
attached as Exhibit 3.

20.   In the event of a breach of this Agreement by RBS
Securities Japan, if the Department elects to pursue criminal

charges, or any civil or administrative action that was not filed as a result of this Agreement, then:

> a. RBS Securities Japan agrees that any applicable statute of limitations is tolled between the date of RBS Securities Japan's signing of this Agreement and the discovery by the Department of any breach by RBS Securities Japan plus one year; and
>
> b. RBS Securities Japan gives up all defenses based on the statute of limitations (as described in Paragraph 13), any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution or action, except to the extent that such defenses existed as of the date of the signing of this Agreement.

## Complete Agreement

21.   This document states the full extent of the
agreement between the parties.   There are no other promises or
agreements, express or implied.   Any modification of this Agreement
shall be valid only if set forth in writing in a supplemental or
revised plea agreement signed by all parties.

AGREED:

FOR RBS Securities Japan Limited:

Date: 2/5/2013          By:      Kengo Okamoto
                                 Kengo Okamoto
                                 Head of RBS Legal Japan

Date: 2/5/13            By:
                                 David Raskin, Esq.
                                 David Yeres, Esq.
                                 Robert G. Houck, Esq.
                                 Clifford Chance US LLP

FOR THE DEPARTMENT OF JUSTICE, CRIMINAL DIVISION, FRAUD SECTION:

DENIS J. McINERNEY
Chief, Fraud Section
Criminal Division
United States Department of Justice

Date: February 5, 2013    By: _____

Patrick F. Stokes
Daniel A. Braun
Deputy Chiefs, Fraud Section

Date: February 5, 2013    By: _____

Gary A. Winters
Trial Attorney, Fraud Section


FOR THE DEPARTMENT OF JUSTICE, ANTITRUST DIVISION:

DEIRDRE A. McEVOY
Chief, New York Field Office
Antitrust Division
United States Department of Justice

Date: 2/5/13    By: _____

Elizabeth B. Prewitt
Assistant Chief,
New York Field Office
Antitrust Division

Date: 2/5/13    By: _____

Eric L. Schleef
Richard A. Powers
Trial Attorneys, Antitrust Division

## CERTIFICATE OF COUNSEL

I am counsel for RBS SECURITIES JAPAN LIMITED ("RBS Securities Japan") in the matter covered by this Agreement. In connection with such representation, I have examined relevant RBS Securities Japan documents and have discussed the terms of this Agreement with RBS Securities Japan's Board of Directors. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of RBS Securities Japan has been duly authorized to enter into this Agreement on behalf of RBS Securities Japan and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of RBS Securities Japan and is a valid and binding obligation of RBS Securities Japan. Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and the Head of RBS Legal Japan. I have fully advised them of the rights of RBS Securities Japan, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of RBS Securities Japan to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: February 5, 2013     By: _____

David Raskin, Esq.
David Yeres, Esq.
Robert G. Houck, Esq.
Clifford Chance US LLP
Counsel for RBS Securities
Japan Limited

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for RBS Securities Japan Limited ("RBSSJ"). I understand the terms of this Agreement and voluntarily agree, on behalf of RBSSJ, to each of its terms. Before signing this Agreement, I consulted outside counsel for RBSSJ. Counsel fully advised me of the rights of RBSSJ, of possible defences, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of RBSSJ. I have advised and caused outside counsel for RBSSJ to advise the Board of Directors fully of the rights of RBSSJ, of possible defences, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of RBSSJ, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am duly authorized by RBSSJ to execute this Agreement on behalf of RBSSJ.

Date: 4 February, 2013

RBS Securities Japan Limited

By: *Kengo Okamoto*

Kengo Okamoto
Head of RBS Legal Japan

## EXHIBIT 1

### Certificate of Corporate Resolutions

A copy of the executed Certificate of Corporate Resolutions is annexed hereto as "Exhibit 1."

## CERTIFICATE OF CORPORATE RESOLUTION OF RBS SECURITIES JAPAN LIMITED

On February 4, 2013, the Board of Directors of RBS Securities Japan Limited (the "**Company**") resolved as follows:

Having considered:

The discussions between the Company, through its legal counsel, and the United States Department of Justice, Criminal Division, Fraud Section, and the Antitrust Division (together, the "**DOJ**") regarding its investigation into potential criminal violations related to the London Interbank Offered Rate ("**LIBOR**") and other benchmark interest rates (the "**LIBOR Investigation**").

The terms of the proposed Information and a Plea Agreement, with appendices, as circulated to the Board on February 4, 2013 (the "**Plea Agreement**").

The advice to the Board from its legal counsel regarding the terms of the Plea Agreement, as well as the advice regarding the waiver of rights and other consequences of signing the Plea Agreement.

The Board hereby **RESOLVES** that:

1. It is in the Company's best commercial interests to enter the guilty plea provided for, and agrees to the other terms provided in the Plea Agreement with the DOJ in substantially the form and substance of the form of Plea Agreement presented to this Board.

2. The directors of the Company and legal counsel for the Company are hereby each individually authorized on behalf of the Company, to execute and deliver the Plea Agreement, substantially in such form as reviewed by this Board, with such changes as such directors or legal counsel may approve.

3. The directors of the Company and legal counsel for the Company are hereby each individually authorized to take any actions necessary or appropriate, and to approve the forms, terms or provisions of any agreement or other documents necessary to effectuate the intent of these Written Resolutions (including execution and delivery of any such agreement or document on behalf of the Company).

4. Kengo Okamoto, Head of RBS Legal Japan or his delegate, is authorized (i) to execute the Plea Agreement on behalf of the Company, with such modifications as he may approve, (ii) to act and speak on behalf of the Company, in any proceeding or as otherwise necessary, for the purpose of executing the Plea Agreement, including entry of a guilty plea on behalf of the Company, and (iii) to take further action necessary to carry into effect the intent and purpose of these Written Resolutions.

5. In addition to such other delegates as he may select, Sheldon Goldfarb, General Counsel, RBS Americas and Kathleen McCarthy, Head of Litigation, RBS Americas are delegated the authority granted to Kengo Okamoto by these Written Resolutions.

6.    All of the actions of the directors of the Company and legal counsel for the Company, which actions would have been within the scope of these Written Resolutions except that such actions were taken prior to the adoption of these Written Resolutions, are hereby severally ratified, confirmed, approved and adopted as actions on behalf of the Company.

7.    The representative directors of the Company are individually authorized to provide to the DOJ a certified copy of these Written Resolutions.

Date: February 4, 2013                    By: _____

                                          Director
                                          RBS Securities Japan Limited

## EXHIBIT 2

## Corporate Compliance Undertakings

Attached are the relevant excerpts of: (1) the agreements entered into by RBS Securities Japan Limited's parent, The Royal Bank of Scotland plc ("RBS"), in resolving regulatory investigations in this matter with the United States Commodity Futures Trading Commission.

pursuant to 28 U.S.C. § 1961 (2006). Respondents shall pay the CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Accounts Receivables --- AMZ 340
> E-mail Box: 9-AMC-AMZ-AR-CFTC
> DOT/FAA/MMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> Telephone: (405) 954-5644

If payment is to be made by electronic funds transfer, Respondents shall contact Linda Zurhorst or her successor at the above address to receive payment instructions and shall fully comply with those instructions. Respondents shall accompany payment of the CMP Obligation with a cover letter that identifies the paying Respondents and the name and docket number of this proceeding. The paying Respondents shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

C.   Respondents and their successors and assigns shall comply with the following conditions and undertakings set forth in the Offer:

1. PRINCIPLES[23]

   i. RBS agrees to undertake the following: (1) to ensure the integrity and reliability of its Benchmark Interest Rate Submission(s), presently and in

---

[23]   The following terms are defined as follows:

**Benchmark Interest Rate**: An interest rate for a currency and maturity/tenor that is calculated based on data received from market participants and published to the market on a regular, periodic basis, such as LIBOR and Euribor;

**Benchmark Publisher**: A banking association or other entity that is responsible for or oversees the calculation and publication of a Benchmark Interest Rate;

**Submission(s)**: The interest rate(s) submitted for each currency and maturity/tenor to a Benchmark Publisher. For example, if RBS submits a rate for one month and three month U.S. Dollar LIBOR, that would constitute two Submissions;

**Submitter(s)**: The person(s) responsible for determining and/or transmitting the Submission(s); and

**Supervisor(s)**: The person(s) immediately and directly responsible for supervising any portion of the process of Submission(s) and/or any of the Submitter(s).

the future; and (2) to identify, construct and promote effective methodologies and processes of setting Benchmark Interest Rates, in coordination with efforts by Benchmark Publishers, in order to ensure the integrity and reliability of Benchmark Interest Rates in the future.

ii. RBS represents and undertakes that each Benchmark Interest Rate Submission by RBS shall be based upon a rigorous and honest assessment of information, and shall not be influenced by internal or external conflicts of interest, or other factors or information extraneous to any rules applicable to the setting of a Benchmark Interest Rate.

2. INTEGRITY AND RELIABILITY OF BENCHMARK INTEREST RATE SUBMISSIONS

    i. DETERMINATION OF SUBMISSIONS: RBS shall determine its Submission(s) based on the following Factors, Adjustments and Considerations, unless otherwise prohibited by or contrary to an affirmative obligation imposed by any law or regulation, or the rules or definitions issued by a Benchmark Publisher. RBS's transactions shall be given the greatest weight in determining its Submissions, subject to applying appropriate Adjustments and Considerations in order to reflect the market measured by the Benchmark Interest Rate.[24]

    RBS shall determine its Submissions as described in these Undertakings within fourteen (14) days of the entry of this Order.

    - Factor 1 — RBS's Borrowing or Lending Transactions Observed by RBS's Submitters:

        a. RBS's transactions in the market as defined by the Benchmark Publisher for the particular Benchmark Interest Rate;

        b. RBS's transactions in other markets for unsecured funds, including, but not limited to, certificates of deposit and issuances of commercial paper; and

        c. RBS's transactions in various related markets, including, but not limited to, Overnight Index Swaps, foreign currency forwards, repurchase agreements, futures, and Fed Funds.

---

[24] The rules used by Benchmark Publishers to determine Benchmark Interest Rates vary, may not be consistent with each other, and provide different levels of guidance as to how to make Submissions.

- Factor 2 — Third Party Transactions Observed by RBS's Submitters:

  a. Transactions in the market as defined by the Benchmark Interest Rate relevant to each of the Submission(s);

  b. Transactions in other markets for unsecured funds, including, but not limited to, certificates of deposit and issuances of commercial paper; and

  c. Transactions in various related markets, including, but not limited to, Overnight Index Swaps, foreign currency forwards, repurchase agreements, futures, and Fed Funds.

- Factor 3 — Third Party Offers Observed by RBS's Submitters:

  a. Third party offers to RBS in the market as defined by the Benchmark Publisher relevant to each of the Submission(s);

  b. Third party offers in other markets for unsecured funds, including, but not limited to, certificates of deposit and issuances of commercial paper, provided to RBS by interdealer brokers (*e.g.*, voice brokers); and

  c. Third party offers provided to RBS in various related markets, including, but not limited to, Overnight Index Swaps, foreign currency forwards, repurchase agreements, and Fed Funds.

- Adjustments and Considerations: All of the following Adjustments and Considerations may be applied with respect to each of the Factors above:

  a. Time: With respect to the Factors considered above, proximity in time to the Submission(s) increases the relevance of that Factor;

  b. Market Events: RBS may adjust its Submission(s) based upon market events, including price variations in related markets, that occur prior to the time at which the Submission(s) must be made to the Benchmark Publisher. That adjustment shall reflect measurable effects on transacted rates, offers or bids;

  c. Term Structure: As RBS applies the above Factors, if RBS has data for any maturity/tenor described by a Factor, then

RBS may interpolate or extrapolate the remaining maturities/tenors from the available data;

d. Credit Standards: As RBS applies the above Factors, adjustments may be made to reflect RBS's credit standing and/or the credit spread between the market as defined by the Benchmark Publisher and transactions or offers in the related markets used in the Factors above. Additionally, RBS may take into account counterparties' credit standings, access to funds, and borrowing or lending requirements, and third party offers considered in connection with the above Factors; and

e. Non-representative Transactions: To the extent a transaction included among the Factors above significantly diverges in an objective manner from other transactions, and that divergence is not due to market events as addressed above, RBS may exclude such transactions from its determination of its Submission(s).

ii. SUPERVISOR(S) REVIEW: Effective within fourteen (14) days of the entry of this Order, each daily Submission shall be reviewed by a Supervisor on a daily basis after the Submission(s) are made to the Benchmark Publisher.[25]

iii. QUALIFICATIONS OF SUBMITTER(S) AND SUPERVISOR(S): All Submitter(s) shall have significant experience in the markets for the Benchmark Interest Rate to which they are submitting or a comparable market, but may designate less experienced parties, who routinely work under their supervision, to make Submission(s) during limited periods of absence. All Supervisors shall have significant experience in the markets for the relevant Benchmark Interest Rate or a comparable market. Submitters, Supervisors and any parties designated to make Submission(s) when the Submitter(s) are absent shall not be assigned to any derivatives trading desk, unit or division within RBS, or participate in derivatives trading other than that associated with RBS's liquidity and liability management. The compensation of Submitter(s) and Supervisor(s) also shall not be directly based upon derivatives trading, other than that associated with RBS's liquidity and liability management.

---

[25]    Insofar as this Section 2 of the Undertakings entitled "INTEGRITY AND RELIABILITY OF BENCHMARK INTEREST RATE SUBMISSIONS" applies to RBS offices in Russia, Romania and Indonesia, RBS shall have until October 25, 2013 to implement the provisions of this section with respect to those three offices; provided, however, for those offices, RBS must comply with Section 2(i) above and make its Submissions in accordance with the Factors, Adjustments and Considerations identified above within 14 days of the entry of the Order.

iv. FIREWALLS: INTERNAL CONTROLS REGARDING IMPROPER COMMUNICATIONS AND SUBMISSIONS: RBS shall implement internal controls and procedures to prevent improper communications with Submitter(s) and Supervisor(s) regarding Submission(s) or prospective Submission(s) to ensure the integrity and reliability of its Submission(s). Such internal controls and procedures shall include, but not be limited to:

- The "firewalls" contemplated herein will be implemented through written policies and procedures that delineate proper and improper communications with Submitter(s) and Supervisor(s), whether internal or external to RBS. For these purposes, improper communications shall be any attempt to influence RBS's Submission(s) for the benefit of any derivatives trading position (whether of RBS or any third party) or any attempt to cause RBS's Submitter(s) to violate any applicable Benchmark Publisher's rules or definitions, or Section 2 of these Undertakings; and

- A requirement that the Submitter(s) shall not be located in close proximity to traders who primarily deal in derivatives products that reference a Benchmark Interest Rate to which RBS contributes any Submission(s). The two groups should be separated such that neither can hear the other.

v. DOCUMENTATION: RBS shall provide the documents set forth below promptly and directly to the Commission upon request, without subpoena or other process, regardless of whether the records are held outside of the United States, to the extent permitted by law.

- For each Submission, RBS shall contemporaneously memorialize, and retain in an easily accessible format for a period of five (5) years after the date of each Submission, the following information:

  a. The Factors, Adjustments and Considerations described in Section 2(i) above that RBS used to determine its Submission(s), including, but not limited to, identifying any non-representative transactions excluded from the determination of the Submission(s) and the basis for such exclusions, as well as identifying all transactions given the greatest weight or considered to be the most relevant, and the basis for such conclusion;

  b. All models or other methods used in determining RBS's Submission(s), such as models for credit standards and/or term structure, and any adjustments made to the Submission(s) based on such models or other methods;

c. Relevant data and information received from interdealer brokers used in connection with determining RBS's Submission(s) including, but not limited to, the following:

- Identification of the specific offers and bids relied upon by RBS when determining each Submission; and

- The name of each company and person from whom the information or data is obtained;

d. RBS's assessment of "reasonable market size" for its Submission(s) (or any other such criteria for the relevancy of transactions to a Benchmark Interest Rate), to the extent that the rules for a Benchmark Interest Rate require that pertinent transactions considered in connection with Submission(s) be of "reasonable market size" (or any other such criteria);

e. Information regarding market events considered by RBS in connection with determining its Submission(s), including, without limitation, the following:

- The specific market announcement(s) or event(s); and

- Any effect of such market event(s) on transacted rates, offers or bids in the relevant markets; and

f. The identity of the Submitter(s) who made, and the Supervisor(s) who reviewed, the Submission(s).

- For each Submission, RBS shall retain for a period of five (5) years after the date of each Submission, the following transactional data used by RBS to determine its Submission(s); the data shall be easily accessible and convertible into the Microsoft Excel file format; the data shall include, without limitation, the following to the extent known to RBS at the time of the Submission(s):

a. Instrument;
b. Maturity/tenor;
c. Trade type (*i.e.*, loan/deposit, placing/taking);
d. Buy/sell indicator;
e. Transaction date (in mmddyyyy format);
f. Maturity date (in mmddyyyy format);
g. Value date (in mmddyyyy format);
h. Loan effective date;

    i. Customer number;

    j. Currency;

    k. Ticket ID;

    l. Timestamp;

    m. Counterparty A (buyer/bidder);

    n. Counterparty B (seller/offeror);

    o. Nominal/notional size of the transaction;

    p. Interest basis (360/365 day year);

    q. The fixed interest rate; and

    r. Any special or additional terms (*e.g.*, a repurchase agreement or some form of "non-vanilla agreement").

- <u>Transaction Records</u>: RBS shall retain for a period of five (5) years trade transaction records and daily position and risk reports, including (without limitation) monthly and quarterly position and risk reports, related to the trading activities of Submitter(s) and traders who primarily deal in derivatives products that reference a Benchmark Interest Rate; the records and reports shall be easily accessible and convertible into the Microsoft Excel file format.

- <u>Requirement To Record Communications</u>: RBS shall record and retain to the greatest extent practicable all of the following communications:

    a. All communications concerning the determination and review of the Submission(s); and

    b. All communications of traders who primarily deal in derivatives products that reference a Benchmark Interest Rate concerning trades, transactions, prices, or trading strategies pertaining to any derivative that references any Benchmark Interest Rate (or the supervision thereof).

The above communications shall not be conducted in a manner to prevent RBS from recording such communications;

Audio communications of Submitters and Supervisors shall be retained for a period of one (1) year. Audio communications of traders who primarily deal in derivatives products that reference a Benchmark Interest Rate, and who are located in the London, Tokyo, Singapore, and Connecticut offices of RBS, shall be retained for a period of six (6) months. Subject to a reasonable time to implement, RBS's audio retention requirements pursuant to these Undertakings shall commence within a reasonable period after the entry of this Order and shall continue for a period of five (5) years thereafter;

All communications except audio communications shall be retained for a period of five (5) years; [26] and

Nothing in these Undertakings shall limit, restrict or narrow any obligations pursuant to the Act or the Commission's Regulations promulgated thereunder, including but not limited to Regulations 1.31 and 1.35, 17 C.F.R. §§ 1.31 and 1.35 (2012), in effect now or in the future.

## vi. MONITORING AND AUDITING:

* Monitoring: RBS shall maintain or develop monitoring systems or electronic exception reporting systems that identify possible improper or unsubstantiated Submissions. Such reports will be reviewed on at least a weekly basis and if there is any significant deviation or issues, the underlying documentation for the Submission shall be reviewed to determine whether the Submission is adequately substantiated. If it is not substantiated, RBS shall notify its chief compliance officer(s) and the Benchmark Publisher;

* Periodic Audits: Starting six (6) months from the date of the entry of this Order, and continuing every six (6) months thereafter, unless an annual audit is scheduled at the same time, RBS shall conduct internal audits of reasonable, random samples of its Submission(s), the factors and all other evidence documenting the basis for such Submission(s), and communications of the Submitter(s) in order to verify the integrity and reliability of the process for determining Submission(s); and

* Annual Audits By Third Party Auditors: Starting one (1) year from the date of the entry of this Order, and continuing annually for four (4) additional years thereafter, RBS shall retain an independent, third-party auditor to conduct an audit of its Submission(s) and the process for determining Submission(s), which shall include, without limitation, the following:

---

[26]     RBS also shall improve its current and future proprietary messaging systems within six (6) months of the entry of this Order. To ensure the prompt searching and retrieval of such internal messages, RBS shall retain all such messages in a form that identifies clearly the following information: a unique identifying code for each such internal communication such that it can be retrieved and referenced; specific identification of each participant in such a communication; with respect to a communication that takes the form of a chat room with three or more participants, the date and time (including applicable time zone) that each person joined and left that chat room; and the text of each message within each communication, including a date and time stamp for each message within a communication (including the applicable time zone).

a. Reviewing communications of Submitter(s) and Supervisor(s);

b. Interviewing the Submitter(s) and Supervisor(s), to the extent they are still employed by RBS;

c. Obtaining written verification from the Submitter(s) and Supervisor(s), to the extent they are still employed by RBS, that the Submission(s) were consistent with this Order, the policies and procedures in place for making RBS's Submission(s), and the definitions applicable to the Benchmark Interest Rate for which RBS made Submission(s); and

d. A written audit report to be provided to RBS and the Commission (with copies addressed to the Commission's Division of Enforcement (the "Division")).

vii. POLICIES, PROCEDURES AND CONTROLS: Within sixty (60) days of the entry of this Order, RBS shall develop policies, procedures and controls to comply with each of the specific Undertakings set forth above with the goal of ensuring the integrity and reliability of its Submission(s). In addition, RBS shall develop policies, procedures and controls to ensure the following:

- The supervision of the Submission process;

- That any violations of the Undertakings or any questionable, unusual or unlawful activity concerning RBS's Submissions are reported to and investigated by RBS's compliance or legal personnel and reported, as necessary, to authorities and the Benchmark Publishers;

- The periodic but routine review of electronic communications and audio recordings of or relating to the Submission Process;

- Not less than monthly, the periodic physical presence of compliance personnel on the trading floors of the Submitter(s) and/or traders who primarily deal in derivatives products that reference a Benchmark Interest Rate in connection with these Policies, Procedures and Controls;

- The handling of complaints concerning the accuracy or integrity of RBS's Submission(s) including:

a. Memorializing all such complaints;

    b. Review and follow-up by the chief compliance officer(s) or his designee of such complaints; and

  ■ The reporting of material complaints to the Chief Executive Officer and Board of Directors, relevant self-regulatory organizations, the relevant Benchmark Publisher, the Commission, and/or other appropriate regulators.

viii. <u>TRAINING</u>: RBS shall develop training programs for all employees who are involved in its Submission(s), including, without limitation, Submitters and Supervisors, and all traders who primarily deal in derivatives products that reference a Benchmark Interest Rate. Submitters and Supervisors shall be provided with preliminary training regarding the policies, and procedures and controls developed pursuant to Section 2(vii) of these Undertakings. By no later than October 25, 2013, all Submitters, Supervisors, and traders who primarily deal in derivatives products that reference a Benchmark Interest Rate shall be fully trained in the application of these Undertakings to them, as set forth herein. Thereafter, such training will be provided promptly to employees newly assigned to any of the above listed responsibilities, and again to all Submitters, Supervisors and traders who primarily deal in derivatives products that reference a Benchmark Interest Rate as part of RBS's regular training programs. The training shall be based upon the individual's position and responsibilities, and as appropriate, address the following topics:

  ■ The Undertakings set forth herein;

  ■ The process of making Submission(s);

  ■ The impropriety of attempting to influence the determination of RBS's Submission(s);

  ■ The requirement to conduct all business related to RBS's Submission(s) on RBS's recorded telephone and electronic communications systems, and not on personal telephones or other electronic devices, as set forth in Section 2(v) of these Undertakings;

  ■ The requirement to conduct certain business related to derivatives products that reference a Benchmark Interest Rate on RBS's recorded telephone and electronic communications systems, and not on personal devices or systems, as set forth in Section 2(v) of these Undertakings;

  ■ The policies and procedures developed and instituted pursuant to these Undertakings; and

- The employment and other potential consequences if employees act unlawfully or improperly in connection with RBS's Submission(s) or process for determining Submission(s).

ix. REPORTS TO THE COMMISSION:

- Compliance with Undertakings: Every four (4) months, starting 120 days from the entry of this Order, RBS shall make interim reports to the Commission, through the Division, explaining its progress towards compliance with the Undertakings set forth herein. Within 365 days of the entry of this Order, RBS shall submit a report to the Commission, through the Division, explaining how it has complied with the Undertakings set forth herein. The report shall attach copies of and describe the internal controls, policies and procedures that have been designed and implemented to satisfy the Undertakings. The report shall contain a certification from a representative of RBS's Executive Management, after consultation with RBS's chief compliance officer(s), that RBS has complied with the Undertakings set forth above, and that it has established policies, procedures and controls to satisfy the Undertakings set forth in this Order;

- Submitter(s), Supervisor(s), and Heads of Appropriate Trading Desks: Within fourteen (14) days of the entry of this Order, or as soon as practicable thereafter, RBS shall provide, meet with and explain these Undertakings to all Submitters, Supervisors and the head of each trading desk that primarily deals in derivatives that reference a Benchmark Interest Rate. Within that same time frame, RBS shall provide to the Commission, through the Division, written or electronic affirmations signed by each Submitter, Supervisor, and head of each trading desk that primarily deals in derivatives that reference a Benchmark Interest Rate, stating that he or she has received and read the Order and Undertakings herein, and that he or she understands these Undertakings to be effective immediately; and

- Disciplinary and Other Actions: RBS shall promptly report to the Commission, through the Division, all improper conduct related to any Submission(s) or the attempted manipulation or manipulation of a Benchmark Interest Rate, as well as any disciplinary action, or other law enforcement or regulatory action related thereto, unless *de minimis* or otherwise prohibited by applicable laws or regulations.

3. DEVELOPMENT OF RIGOROUS STANDARDS FOR BENCHMARK INTEREST RATES

To the extent RBS is or remains a contributor to any Benchmark Interest Rate, RBS agrees to make its best efforts to participate in efforts by current and future Benchmark Publishers, other price reporting entities and/or regulators to ensure the reliability of Benchmark Interest Rates, and through its participation to encourage the following:

    i.  METHODOLOGY: Creating rigorous methodologies for the contributing panel members to formulate their Submissions. The aim of such methodologies should be to result in a Benchmark Interest Rate that accurately reflects the rates at which transactions are occurring in the market being measured by that Benchmark Interest Rate;

    ii.  VERIFICATION: Enforcing the use of those methodologies through an effective regime of documentation, monitoring, supervision and auditing, required by and performed by the Benchmark Publishers, and by the contributing panel members internally;

    iii.  INVESTIGATION: Facilitating the reporting of complaints and concerns regarding the accuracy or integrity of Submissions to Benchmark Interest Rates or the published Benchmark Interest Rate, and investigating those complaints and concerns thoroughly;

    iv.  DISCIPLINE: Taking appropriate action if, following a thorough confidential investigation, the Benchmark Publisher determines that a complaint or concern regarding the accuracy or integrity of a Submission or the published Benchmark Interest Rate has been substantiated;

    v.  TRANSPARENCY: Making regular reports to the public and the markets of facts relevant to the integrity and reliability of each Benchmark Interest Rate. Such reports should include, but not be limited to, the following:

        ▪  At the time each Benchmark Interest Rate is published, the Benchmark Publisher should display prominently whether each rate is based entirely on transactions in the market the rate is supposed to reflect, or whether it instead is based, in whole or in part, on other data or information;

        ▪  The Benchmark Publisher also should make periodic reports regarding the number and nature of complaints and concerns received regarding the accuracy or integrity of Submissions or the published Benchmark Interest Rate while maintaining the anonymity of all those who have reported or are the subject of complaints and concerns;

- The Benchmark Publisher should additionally make periodic reports regarding the results of all investigations into such complaints and concerns while maintaining the anonymity of all those involved in investigations that have not yet been completed; and

vi. <u>FORMULATION</u>: Periodically examining whether each Benchmark Interest Rate accurately reflects the rate at which transactions are occurring in the market being measured (using the statistical method prescribed by that Benchmark Interest Rate), and evaluating whether the definition and instructions should be revised, or the composition of the panel changed;

Such examinations should include a rigorous mathematical comparison of transactions in the relevant market with the published Benchmark Interest Rate on the same day over a specified period, and a determination of whether any differences are statistically or commercially significant.

RBS shall report periodically, on at least a quarterly basis, to the Commission, through the Division, either orally or in writing, on its participation in such efforts, to the extent that such reporting is not otherwise prohibited by law or regulations, by the rules issued by Benchmark Publishers, or by nondisclosure agreements by and between RBS and Benchmark Publishers.

## 4. COOPERATION WITH THE COMMISSION

i. Respondents shall cooperate fully and expeditiously with the Commission, including the Division, and any other governmental agency in this action, and in any investigation, civil litigation, or administrative matter related to the subject matter of this action or any current or future Commission investigation related thereto. As part of such cooperation, Respondents agree to the following for a period of five (5) years from the date of the entry of this Order, or until all related investigations and litigation are concluded, including through the appellate review process, whichever period is longer:

- Preserve all records relating to the subject matter of this proceeding, including, but not limited to, audio files, electronic mail, other documented communications, and trading records;

- Comply fully, promptly, completely, and truthfully with all inquiries and requests for information or documents;

- Provide authentication of documents and other evidentiary material;

- Provide copies of documents within RBS's possession, custody or control;

- Subject to applicable laws and regulations, RBS will make its best efforts to produce any current (as of the time of the request) officer, director, employee, or agent of RBS, regardless of the individual's location, and at such location that minimizes Commission travel expenditures, to provide assistance at any trial, proceeding, or Commission investigation related to the subject matter of this proceeding, including, but not limited to, requests for testimony, depositions, and/or interviews, and to encourage them to testify completely and truthfully in any such proceeding, trial, or investigation; and

- Subject to applicable laws and regulations, RBS will make its best efforts to assist in locating and contacting any prior (as of the time of the request) officer, director, employee or agent of RBS;

  ii.  RBS also agrees that it will not undertake any act that would limit its ability to cooperate fully with the Commission. RBS will designate an agent located in the United States of America to receive all requests for information pursuant to these Undertakings, and shall provide notice regarding the identity of such Agent to the Division upon entry of this Order. Should RBS seek to change the designated agent to receive such requests, notice of such intention shall be given to the Division fourteen (14) days before it occurs. Any person designated to receive such request shall be located in the United States of America; and

  iii.  RBS and the Commission agree that nothing in these Undertakings shall be construed so as to compel RBS to continue to contribute Submission(s) related to any Benchmark Interest Rate. Without prior consultation with the Commission, RBS remains free to withdraw from the panel of contributors to any Benchmark Interest Rate.

## 5. PROHIBITED OR CONFLICTING UNDERTAKINGS

Should the Undertakings herein be prohibited by, or be contrary to the provisions of any obligations imposed on RBS by any presently existing, or hereinafter enacted or promulgated laws, regulations, regulatory mandates, or the rules or definitions issued by a Benchmark Publisher, then RBS shall promptly transmit notice to the Commission (through the Division) of such prohibition or conflict, and shall meet and confer in good faith with the Commission (through the Division) to reach an agreement regarding possible modifications to the Undertakings herein sufficient to resolve such inconsistent obligations. In the interim, RBS will abide by the obligations imposed by the law, regulations, regulatory mandates and Benchmark Publishers' rules and definitions. Nothing in

these Undertakings shall limit, restrict or narrow any obligations pursuant to the Act or the Commission's Regulations promulgated thereunder, including but not limited to Regulations 1.31 and 1.35, 17 C.F.R. §§ 1.31 and 1.35 (2012), in effect now or in the future.

6. PUBLIC STATEMENTS

Respondents agree that neither they nor any of their successors and assigns, agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in this Order or creating, or tending to create, the impression that this Order is without a factual basis; provided, however, that nothing in this provision shall affect Respondents' (i) testimonial obligations, or (ii) right to take legal positions in other proceedings to which the Commission is not a party. Respondents and their successors and assigns shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement.

D. Partial Satisfaction: Respondents understand and agree that any acceptance by the Commission of partial payment of Respondents' CMP Obligation shall not be deemed a waiver of their obligation to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

**The provisions of this Order shall be effective as of this date.**

By the Commission.


_____
Melissa Jurgens
Secretary of the Commission
Commodity Futures Trading Commission

Dated: February ____, 2013

54

# EXHIBIT 3

**EXHIBIT 3**

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Plea Agreement between the Fraud Section of the Criminal Division and the Antitrust Division of the United States Department of Justice (together, the "Department") and RBS Securities Japan Limited ("RBS Securities Japan" or "RBSSJ"), and RBS Securities Japan hereby agrees and stipulates that the following information is true and accurate. RBS Securities Japan admits, accepts, and acknowledges that it is responsible for the acts of its officers, employees, and agents as set forth below. Had this matter proceeded to a trial or sentencing hearing, the Department would have proven, by the applicable standard of proof and by admissible evidence, the facts alleged below and set forth in the criminal Information. This evidence would establish the following:

I.

BACKGROUND

A.      *LIBOR*

1.      Since its inception in approximately 1986, the London Interbank Offered Rate ("LIBOR") has been a benchmark interest rate used in financial markets around the world. Futures, options, swaps, and other derivative financial instruments traded in the over-the-counter market and on exchanges worldwide

are settled based on LIBOR. The Bank of International Settlements has estimated that in the second half of 2009, for example, the notional amount of over-the-counter interest rate derivative contracts was valued at approximately $450 trillion. In addition, mortgages, credit cards, student loans, and other consumer lending products often use LIBOR as a reference rate.

2.    LIBOR is published under the auspices of the British Bankers' Association ("BBA"), a trade association with over 200 member banks that addresses issues involving the United Kingdom banking and financial services industries. The BBA defines LIBOR as:

> The rate at which an individual Contributor Panel bank could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size, just prior to 11:00 [a.m.] London time.

This definition has been in place since approximately 1998.

3.    LIBOR rates were initially calculated for three currencies: the United States Dollar, the British Pound Sterling, and the Japanese Yen. Over time, the use of LIBOR expanded, and benchmark rates were calculated for ten currencies, including the original three.

4.    The LIBOR for a given currency is the result of a calculation based upon submissions from a panel of banks for that currency (the "Contributor Panel") selected by the BBA. Each member of the Contributor Panel submits its rates every

London business day through electronic means to Thomson Reuters, as an agent for the BBA, by 11:10 a.m. London time. Once each Contributor Panel bank has submitted its rate, the contributed rates are ranked. The highest and lowest quartiles are excluded from the calculation, and the middle two quartiles (i.e., 50% of the submissions) are averaged to formulate the resulting LIBOR "fix" or "setting" for that particular currency and maturity.

5.    The LIBOR contribution of each Contributor Panel bank is submitted to between two and five decimal places, and the LIBOR fix is rounded, if necessary, to five decimal places. In the context of measuring interest rates, one "basis point" (or "bp") is one-hundredth of one percent (0.01%).

6.    Thomson Reuters calculates and publishes the rates each business day by approximately 11:30 a.m. London time. Fifteen maturities (or "tenors") are quoted for each currency, ranging from overnight to twelve months. The published rates are made available worldwide by Thomson Reuters and other data vendors through electronic means and through a variety of information sources. In addition to the LIBOR fix resulting from the calculation, Thomson Reuters publishes each Contributor Panel bank's submitted rates along with the names of the banks.

7.    According to the BBA, each Contributor Panel bank must submit its rate without reference to rates contributed by other Contributor Panel banks. The basis for a Contributor Panel

bank's submission, according to a clarification the BBA issued in June 2008, must be the rate at which members of the bank's staff primarily responsible for management of the bank's cash, rather than the bank's derivatives trading book, consider that the bank can borrow unsecured inter-bank funds in the London money market. Further, according to the BBA, a Contributor Panel bank may not contribute a rate based on a desire to benefit its position in any derivative financial instrument. In other words, a Contributor Panel bank's LIBOR submissions should not be influenced by its motive to maximize profit or minimize losses in derivatives transactions tied to LIBOR.

8.     From at least 2006 through 2010, the Contributor Panel for Yen LIBOR was comprised of 16 banks, including The Royal Bank of Scotland plc ("RBS").

9.     Because of the widespread use of LIBOR in financial markets, this rate plays a fundamentally important role in financial systems around the world.

B.          *Interest Rate Swaps and Forward Rate Agreements*

10.     An interest rate swap ("swap") is a financial derivative instrument in which two parties agree to exchange interest rate cash flows. If, for example, a party has a transaction in which it pays a fixed rate of interest but wishes to pay a floating rate of interest tied to a reference rate, it can enter into an interest rate swap to exchange its fixed rate

4

obligation for a floating rate one. Commonly, for example, Party A pays a fixed rate to Party B, while Party B pays a floating interest rate to Party A indexed to a reference rate like LIBOR. There is no exchange of principal amounts, which are commonly referred to as the "notional" amounts of the swap transactions. Interest rate swaps are traded over-the-counter; in other words, they are negotiated in transactions between counterparties and are not traded on exchanges.

11. A forward rate agreement is a derivative contract in which parties specify a rate of interest or currency exchange rate to be paid or received on a notional amount at a future date. Unlike an interest rate swap, which typically provides for an exchange of cash flows over a period of years, a forward rate agreement terminates on the specified settlement date.

12. The market for derivatives and other financial products linked to Yen LIBOR is global and is one of the largest and most active markets for such products in the world. A number of these products are traded in the United States – such as Yen-based swaps contracts traded over the counter – in transactions involving U.S.-based counterparties. For example, more than 15% of the total notional value of the transactions entered into by RBS's Yen derivatives traders from 2006 through 2010 involved U.S.-based counterparties often acting through their overseas offices.

C.       *RBS and RBS Securities Japan*

13.   RBS is a financial services corporation with
headquarters located in Edinburgh, Scotland.  RBS has banking
divisions and subsidiaries around the world, including in the
United States, with its United States headquarters located in
Stamford, Connecticut.  From 2006 to 2010, one of RBS's
divisions was Global Banking and Markets ("GBM").  The GBM
division had employees in multiple legal entities associated
with RBS, including RBS Securities Japan.  RBSSJ is a wholly-
owned subsidiary of RBS that engages in investment banking
operations, including derivatives trading, with its principal
place of business in Tokyo, Japan.  RBS, through its GBM
division, employed money market traders and derivatives traders[1]
throughout the world, including in Stamford, Connecticut, and
London.  Many GBM derivatives traders in Tokyo were employed by
RBS Securities Japan.  RBS's and RBS Securities Japan's
derivatives traders are responsible for trading a variety of
financial instruments, some of which, such as interest rate
swaps and forward rate agreements, are tied to LIBOR.  RBS's
money market traders are responsible for, among other things,

---

[1] The term "derivatives traders" includes traders on RBS's short-term
interest rates desks.  These desks were responsible for shorter-term
derivatives trading books.

6

trading cash and ensuring that RBS has sufficient funding with regard to specific currencies.

D.      *RBS's LIBOR Submissions*

14.    RBS's LIBOR submissions were made by designated LIBOR submitters.  The primary Yen LIBOR submitter was a money market trader based in London.  Other money market traders, and at times derivatives traders, served as backup submitters for Yen LIBOR when the primary submitter was unavailable to make submissions.

II.

THE SCHEME TO DEFRAUD

15.    At various times from as early as 2006 through at least 2010, certain RBSSJ derivatives traders engaged in a scheme to defraud RBS's counterparties by secretly attempting to manipulate and manipulating Yen LIBOR.  They carried out this scheme by attempting to manipulate and manipulating RBS's Yen LIBOR submissions.  Through that conduct, RBSSJ derivatives traders sought to influence, and on some occasions did influence, the published Yen LIBOR rates by acting in concert with RBS's Yen LIBOR submitters to provide false and misleading submissions to Thomson Reuters, which were then incorporated into the calculation of the final published rates.

16.    RBSSJ derivatives traders, including a manager who had a derivatives trading book, engaged in this conduct in order to

7

benefit their trading positions, and thereby increase their profits and decrease their losses. As these derivatives traders understood, they could only achieve those goals at the expense of their counterparties, whose trading positions would be affected to the same extent but in the opposite direction. The derivatives traders did not inform their counterparties that the traders were engaging in efforts to manipulate the Yen benchmarks to which the profitability of their trades was tied.

17. In light of the large notional values that form the basis for many derivatives trades tied to Yen LIBOR, even small movements in the Yen LIBOR rates can have a substantial impact on the profitability of trading positions.

18. To the extent that RBSSJ derivatives traders, in coordination with RBS Yen LIBOR submitters, were able to manipulate RBS's Yen LIBOR submissions, those submissions were false and misleading because they did not reflect RBS's actual and honest assessment of what its submission should have been based on the definition of LIBOR.

19. RBSSJ derivatives traders also entered into trades with counterparties after they had initiated, and while they planned to continue, their efforts to manipulate Yen LIBOR.

20. From the perspective of a counterparty, information that a derivatives trader on the opposite side of a trade was engaging in efforts to manipulate the Yen LIBOR rate to which

the value of the trade was tied was material. False and misleading Yen LIBOR submissions that could affect the published rate were also material from a counterparty's perspective.

21.     RBSSJ derivatives traders who participated in the conduct described above devised and carried out a scheme to defraud their counterparties, and to obtain money and property from their counterparties by means of materially false and fraudulent pretenses and representations, knowing that they were false and fraudulent when made and acting with fraudulent intent.    This deceptive scheme involved efforts by RBSSJ derivatives traders to manipulate more than 100 Yen LIBOR rates.

III.

EXECUTION OF THE SCHEME TO DEFRAUD

22.     In furtherance of the scheme described above and in Count I of the criminal Information, on or about October 5, 2009, an RBSSJ derivatives trader based in Tokyo, Trader-1,[2] engaged in an electronic chat with an RBS derivatives trader based in London regarding RBS's Yen LIBOR submissions for that day.    Trader-1 asked over a series of three messages "can you ask [Submitter-1] if he can lower his 3mth libor?...by 1 bp...thanks[.]"    The London derivatives trader responded to

---

[2] Derivatives traders and submitters are identified in this statement of facts by the same naming convention and numeric identifiers as those that appear in the statement of facts incorporated into the Deferred Prosecution Agreement between the United States and RBS, dated February 6, 2013.

9

Trader-1 over a series of three messages, "yes...asking...
done[.]" In a separate, nearly simultaneous electronic chat,
the London derivatives trader asked Submitter-1, "can you lower
3s libor by 1bp if possible...thanks," to which Submitter-1
responded, "ok[.]" RBS dropped its 3-month Yen LIBOR submission
by 1 basis point, tying it for the third lowest of all
Contributor Panel banks.

IV.

## RBS SECURITIES JAPAN'S ACCOUNTABILITY

23. RBS Securities Japan acknowledges that the wrongful
acts taken by the participating employees in furtherance of the
misconduct set forth above were within the scope of their
employment at RBS Securities Japan. RBS Securities Japan
acknowledges that the participating employees intended, at least
in part, to benefit RBS Securities Japan through the actions
described above. RBS Securities Japan acknowledges that due to
this misconduct, counterparties to derivatives transactions
located in the United States, including financial institutions,
have been exposed to substantial risk of loss and have suffered
actual financial loss.

24. RBS Securities Japan admits that this Statement of
Facts is focused on the specific conduct described in Count One
of the criminal Information and does not represent and is not

intended to represent an exhaustive factual recitation of all
the facts relating to the scheme to defraud as described herein.