UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT


UNITED STATES OF AMERICA,  )
                Plaintiff,  )       NO: 3:13CR73(MPS)
                           )
vs.                    )
                           )       January 6, 2014
RBS SECURITIES JAPAN    )
LIMITED,               )
             Defendants  )      <u>SENTENCING</u>
_____


                      450 Main Street
                  Hartford, Connecticut

B E F O R E:
       THE HONORABLE MICHAEL P. SHEA, U.S.D.J.


A P P E A R A N C E S:
For the Government:       PATRICK F. STOKES,
                        Deputy Chief, Fraud Section
                        GARY A. WINTERS, Trial Attorney
                        U.S. Department of Justice
                        Criminal Division
                        1400 New York Ave., NW
                        Bond Building
                        Washington, DC 20530

For the Defendants:       DAVID RASKIN, ESQUIRE
                        BENJAMIN A. BERRINGER, ESQ.
                        Clifford Chance
                        31 West 52nd Street
                        New York, NY 10019

Court Reporter:           Martha C. Marshall, RMR, CRR
Proceedings recorded by mechanical stenography, transcript
produced by computer

1          THE COURT:  Good morning, everyone.  Please be

2     seated.

3          We're here for sentencing in United States versus

4     RBS Securities Japan, Limited.  The case number is 13CR73.

5     Let's begin with appearances.

6          MR. WINTERS:  Good morning, your Honor.  Gary

7     Winters for the United States and with me is Patrick Stokes.

8          THE COURT:  Good morning.

9          MR. RASKIN:  Good morning, your Honor.  David Raskin

10    of Clifford Chance for the Defendant.  Sitting to my left is

11    Sheldon Goldfarb who you may remember from the plea.  He's

12    the general counsel for the Americas RBS and is the corporate

13    representative in this case.  And to his left is Ben

14    Berringer who is also from Clifford Chance.

15         THE COURT:  Good morning.  The record should reflect

16    that United States Probation Officer Kristin Moran is also

17    with us.

18         On April 12, 2013, the defendant, RBS Securities

19    Japan, Limited, which I'll called RBS, appeared before the

20    Court and agreed to waive indictment and enter a guilty plea

21    to a one count information charging the Defendant with wire

22    fraud, in violation of Title 18 Section 1343.

23         A Presentence Report was thereafter prepared for the

24    Court by the U.S. Probation Office.  The initial report was

25    dated November 25, 2013.  The final report was dated December

1    18, 2013 with attachments.

2         Defense counsel and the Government had an

3    opportunity to make objections to the initial report, but did

4    not.  I have reviewed all of these materials and I've

5    consulted with the principal author of the report, Ms. Moran.

6    I've also reviewed Officer Moran's sentencing recommendation

7    dated December 18th, and the parties joint sentencing

8    memorandum dated December 31st.

9         Let me begin by asking about whether -- the

10   Government about whether notice was provided to potential

11   victims.

12        MR. WINTERS:  Yes, your Honor.  Notice has been

13   provided pursuant to the Court's order of April 12th on the

14   United States Justice Department's website.  That's been a

15   continuing notice that's gone out.

16        THE COURT:  Very well.  And I think last time we

17   talked about notice in various publications.  Given the fact

18   that notice was provided in those publications for the plea

19   hearing as well as on the website, and given the fact that no

20   victims appeared at the plea hearing and there are not any

21   members of the public or victims in the courtroom today, I

22   think that notice was adequate.  I take it that the Justice

23   Department was not contacted by any victims.

24        MR. WINTERS:  We've not been contacted by any

25   victims.

1           THE COURT:  All right.  Thank you.

2           Now, Attorney Raskin, have you and your client had

3     an opportunity to read and discuss the Presentence Report?

4           MR. RASKIN:  We have, your Honor.  And we have no

5     objections.  Just a few minor corrections, if you'd like to

6     take them now.

7           THE COURT:  Yes, please.

8           MR. RASKIN:  First, on the cover page, at the very

9     bottom listing for predecessor companies should be removed.

10    It references another bank and there aren't any predecessor

11    companies at issue here.

12          And flipping to the second page, the very first

13    line, related cases, refers to another bank's case and should

14    read the Royal Bank of Scotland plc 3:13CR74.

15          THE COURT:  Bear with me one second, please.

16          Okay.  I'm sorry.  Can you just repeat the one on

17    page two of the Presentence Report?

18          MR. RASKIN:  Sorry, your Honor.  The first line

19    under related case.

20          THE COURT:  Oh, I see.

21          MR. RASKIN:  It refers to the wrong related case.

22          THE COURT:  It should be?

23          MR. RASKIN:  It should be U.S. v. the Royal Bank of

24    Scotland plc.  And the docket number of that case is 3:13CR74

25    (MPS).

1    THE COURT:  Right.  Of course, that's the parent

2  company's deferred prosecution.

3        Anything else?

4    MR. RASKIN:  Yes.  Finally, on paragraph 62 which is

5  on page 15 of the PSR.  First, two minor points.  On line

6  four and line five, the reference is to RBSSJ.  Should be

7  RBSSI as in Issac.

8        THE COURT:  I see.

9    MR. RASKIN:  And finally, on the next page.

10        THE COURT:  Just so I'm clear on that one.  In other

11  words, in the -- the felony conviction -- well, let's go

12  back.  RBSSI is referred to in the second sentence as an SEC

13  registered broker/dealer.  That is accurate?

14    MR. RASKIN:  That's correct.

15        THE COURT:  And then what, you would change the next

16  sentence to refer to RBSSI's felony?

17    MR. RASKIN:  No, I'm sorry.  It's the fourth line

18  and I'll just read the beginning of the line.  To suspend or

19  revoke, it said RBSSJ.

20        THE COURT:  I see.  It should be RBSSI's

21  broker/dealer.

22    MR. RASKIN:  Correct.  And the same change on the

23  next line after taken any action against.

24        THE COURT:  I see.  Should be RBSSI as a result of

25  RBSSJ's felony conviction.

1        MR. RASKIN:  Correct.  Lost in the acronyms.

2        THE COURT:  Very good.  Thank you.

3        MR. RASKIN:  And then finally, on the next page,

4   same paragraph, fourth line from the bottom.  The sentence

5   that reads, the outcome of this application is not yet known.

6   We would like to change that or update that to RBSSG, as in

7   George, expects the waiver to be granted.

8        THE COURT:  Should be RBSSG or RBSG.

9        MR. RASKIN:  RBSG.

10       THE COURT:  Expects the waiver to be granted?

11       MR. RASKIN:  Yes.

12       THE COURT:  Anything else?

13       MR. RASKIN:  That's it from the defense.

14       THE COURT:  Anything from the Government.

15       MR. WINTERS:  Nothing from the Government, your

16  Honor.

17       THE COURT:  All right.  There being no other

18  objections to the factual statements of the Presentence

19  Report, the Court adopts the factual statements in the

20  Presentence Report with the modifications identified by

21  Attorney Raskin as its findings of fact in this case and the

22  Presentence Report will be modified to reflect Attorney

23  Raskin's comments.

24       Very briefly, just to go over the maximum penalties

25  again which I explained to -- I'm sorry --

1          MR. RASKIN:  Mr. Goldfarb.

2          THE COURT:  Mr. Goldfarb, I apologize.  Which I

3     explained to him in April, just to briefly review, the

4     following maximum and minimum penalties apply:

5          Under Title 18 Section 1343, and under the

6     alternative fine provision, the maximum fine here is a

7     million dollars or not greater than twice the gross pecuniary

8     gain or twice the gross pecuniary loss.

9          A special assessment of $400 is due.

10         And the defendant could be placed on probation for a

11    maximum of five years.

12         In addition, the Court must order restitution under

13    the mandatory restitution statute unless it finds that

14    certain conditions apply which I will discuss later.

15         At least with respect to that brief statement of the

16    maximum penalties and minimum penalties that apply in this

17    case, does counsel have any objection or correction?

18         MR. RASKIN:  No, your Honor, not from the defense.

19         MR. WINTERS:  Not from the Government.

20         THE COURT:  And are there any disagreements between

21    the parties or with the probation officer's calculation of

22    the Guidelines in the Presentence Report?

23         MR. RASKIN:  No, there aren't.

24         MR. WINTERS:  Not from the Government either.

25         THE COURT:  I do have a few questions for the

1   parties before I turn to my own Guidelines calculation.  I

2   recognize the parties have agreed on a particular disposition

3   and I understand that disposition is part of a larger

4   arrangement the parties have reached.  And I further

5   understand that I don't have to calculate the pecuniary gain

6   or loss with precision.  I do think I still need to have some

7   approximation of or some rationale for why the 50 million

8   dollar figure for this defendant is a sensible one to use.

9   At a minimum, just to ensure that there is a basis to go

10  above the one million dollar fine.

11          So let me start, and I'll ask both parties to

12  respond, if they wish, as to give the Court some idea of how

13  the 50 million dollar disposition with regard to the Japan

14  subsidiary was calculated.  If you'd prefer to back into that

15  by explaining why it's an appropriate piece of the 150

16  million dollar disposition in the deferred prosecution.

17  However you wish to do it, that would be fine.

18          MR. WINTERS:  Sure.  Happy to do so, your Honor.

19          The Government has a methodology which, as you

20  indicated, it's not required to be precise, but it is a

21  significant methodology and it's based on an estimation of

22  the global volume of commerce or, I should say, the global

23  volume of transactions that are based on or are pegged to in

24  some way LIBOR.  So that would include interest rates, swaps,

25  mortgage debt that's tied to LIBOR, consumer debt that's tied

1    to LIBOR, futures transactions, eurodollar futures

2    transaction, a whole series of transactions that are pegged

3    in some way to LIBOR.

4         We then have a methodology for reducing that to the

5    individual currency that is involved which, in this case, is

6    the Japanese yen.  We then have a methodology to reducing

7    that to the specific tenors.  Namely, that's the length --

8         THE COURT:  Three month, one year.

9         MR. WINTERS:  Three month, one year, six month, and

10   so forth.  In a way of reducing it to the number, the tenors

11   that are involved.  And then we have a methodology for making

12   an estimate of what would be the effect, what would be the

13   global effect, if there were a manipulation by a single bank

14   of a single basis point on a single debt.

15        THE COURT:  Just to satisfy my curiosity a little

16   bit, tell me a little bit about that methodology.  In other

17   words, kind of one of the -- and I know that both counsel are

18   far more sophisticated in this than I am, but one thing that

19   struck me here, given that, as I understand it, that LIBOR is

20   an average of a selection of 15 different contributions by

21   different banks, that selection, as I understand it,

22   excluding highs and lows.  In theory one could imagine that

23   if one was always particularly high or particularly low that,

24   in fact, at least in a direct way one would not affect LIBOR

25   at all, even if one were manipulating.  But I imagine it's

1    not that simple.  You don't have to go through blow by blow,

2    but just a sense of how it's done.

3         MR. WINTERS:  It's not quite that simple.  We can

4    show mathematically.  I think that's probably the best way to

5    describe it, is that we can show mathematically that a bank,

6    even though there's a possibility that its contribution would

7    be thrown out on a given day, that if it were to manipulate,

8    again, just one, one basis point, and that's the basis of our

9    estimate.  And, of course, in some instances the manipulation

10   could have been by more than one basis point.  So it's a

11   conservative estimate.

12        THE COURT:  A basis point being 1/100th of an

13   interest rate?

14        MR. WINTERS:  Correct.  Sometimes the manipulations

15   are more.  Again, if you use the one basis point

16   manipulation, we can show mathematically it can have a very

17   small affect on the ultimate LIBOR fixing for that particular

18   day.  You then take that change, you look at that change

19   versus what it would have been had the manipulation not

20   occurred, had one basis point manipulation again by that one

21   bank not occurred, and you track that all the way through the

22   effect on all of the transactions.  There are a number of

23   mathematical calculations that are sort of intermediate here

24   that I won't go into, but it tracks all the way through all

25   of the transactions that are either interest rate swaps or

1   mortgage debt or consumer loans, student loans, all of the

2   things that are tied to LIBOR in some way.  And we get that

3   information, by the way, from publicly available data.  In

4   other words, the numbers that we're starting with, the global

5   transactions that are based on LIBOR, that's all coming from

6   publicly available information the Department has available

7   to it, and that I think the defense would have available as

8   well.

9           I mean, I will say, and we have a footnote to this

10  affect that alludes to the uncertainty of making this

11  calculation in our sentencing memorandum.  And I will say

12  that were the matter to be litigated, the parties could take

13  different positions and there could be litigation over this.

14  So it is not a precise, mathematically precise calculation,

15  but it's a calculation that we have a lot of confidence in

16  and that we believe makes an appropriate estimate of the

17  loss.

18          We've come to a number that's just over 50 million

19  dollars.  Again, just based on the manipulations by RBS

20  Securities Japan.  That's all we're focusing on for purposes

21  of this plea.

22          THE COURT:  And when you say loss -- so the 50

23  million is an estimate of the loss.  What exact -- whose

24  loss?

25          MR. WINTERS:  The loss to the people on the other

1  side of the transactions.  Counterparties, all the people who

2  would have been affected.  All the people who had

3  transactions.  Again, those transactions are not necessarily

4  interest rate swaps.  They could be people that held

5  mortgages that were tied to LIBOR, held consumer debt that

6  were tied to LIBOR.  Those are all of the people that would

7  have been affected by a change, again, by the one basis point

8  change that we assume is the effect of a manipulation, of any

9  manipulation by RBSSJ.

10          THE COURT:  And so the 50 million represents the

11  Government's estimate based on the process you described of

12  the loss to counterparties from the criminal conduct by

13  RBSSJ?

14          MR. WINTERS:  I want to say not just counterparties,

15  but all victims.  Anybody who had any transaction that was

16  tied to LIBOR based on the information that we have.

17          THE COURT:  Right.  Because some of those may be

18  much further down the line, right?  In other words, RBSSJ

19  wasn't doing business with a homeowner or somebody who had a

20  credit card, a consumer, but they might have been indirectly

21  affected.

22          MR. WINTERS:  For example, a Japanese student who

23  had taken out a student loan that was tied to LIBOR, that

24  person would be affected.  Again, that's part of the global

25  harm.  It's not just the counterparties to the specific

1    interest rate swaps that RBS or RBSSJ entered into, it's a

2    global harm figure.

3           THE COURT:  Thank you.

4           Attorney Raskin, do you want to add anything?

5           MR. RASKIN:  No, your Honor.

6           THE COURT:  Very well.

7           And then I had, while we're discussing things, I did

8    want to ask one other question, and that is this:  Were the

9    individuals who or have the individuals who engaged in the

10   criminal conduct and were discussed in the Presentence Report

11   been prosecuted either here or in any of the other

12   jurisdictions involved?

13          MR. WINTERS:  Your Honor, there have been -- there's

14   been no prosecution.  There's been no indictment filed, no

15   information filed against any individuals.  There is an

16   ongoing investigation.  There's, as the plea agreement

17   recites, there's continuing cooperation obligations by RBSSJ,

18   and that's ongoing.

19          THE COURT:  I understand that.  And I might have a

20   comment or two at the end about that, but that's fine.

21          All right.  Turning to my own calculation of the

22   offense level under the Guideliness, I find that the

23   applicable base offense level for this matter is set forth in

24   Section 2B1.1 of the Guidelines manual effective November

25   1st, 2013, which is the manual in effect on the date of -- on

1    today's date which is the date of RBSSJ's sentencing and the

2    one, therefore, that the Court will use.

3         Section 2B1.1(a) states that the base offense level

4    for wire fraud in this case is 7.  The offense level of 7

5    will be adjusted as follows:

6         Because the offense involves a loss of more than 50

7    million dollarss, 24 level's are added under Section

8    2B1.1(b)(1)(M), because the offense involved between 50 and

9    249 victims.  Let me stop there.  That's another question I

10   had for the Government.  I know that that information was

11   provided to the probation officer.  Can you just tell me what

12   the factual basis for that is.

13        MR. WINTERS:  Sure.  With respect to that

14   calculation, we're looking at the specific counterparties.

15        THE COURT:  Direct counterparties.

16        MR. WINTERS:  Correct.  We're not considering all

17   the other people in the other transactions.

18        THE COURT:  That's fine.  The Court, therefore, will

19   find that the offense involved between 50 and 249 victims,

20   and therefore four levels are added under Section

21   2B1.1(b)(2)(B).  Because a substantial part of the offense

22   involved a fraudulent scheme that was committed outside the

23   United States and because the offense involved sophisticated

24   means, two levels are added.  The resulting offense level is

25   37.

With regard to the base fine, the base fine is determined in accordance with the offense level fine table in Section 8C2.4(d) of the Guidelines. Because the base offense level is 37, the base fine is $57,500,000. Under the Guidelines, we then calculate the culpability score. The starting score is 5. Because the organization had 50 or more employees and an individual with substantial authority participated in, condoned, or was willfully ignorant of the offense, 2 points are added under 8C2.5(b)(4). Because the Defendant fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of possibility for its criminal conduct, 2 points are subtracted under 8C2.5(g)(2). Therefore, the total culpability score is 5.

Because the culpability score is 5, the minimal multiplier is 1.0 and the maximum multiplier is 2.0 under the Guidelines. Therefore, because the base fine is $57,500,000, the fine range is $57,500,000 to $115,000,000.

Under Section 8D1.1(a), the Court shall impose a term of probation when certain conditions related to the fulfillment of the sentence or a likelihood of recidivism are present. If the Court determines that those conditions exist, the term of probation shall be at least one year but not more than five years. In addition, as I mentioned before, I must impose a special assessment of $400. And I

1    must impose restitution unless certain conditions apply which
2    I will discuss.

3           That's simply my calculation of the Guidelines
4    range.  Does either counsel have any objection to that
5    calculation?

6           MR. RASKIN:  Not from the defense, your Honor.

7           MR. WINTERS:  Not from the Government.

8           THE COURT:  Attorney Raskin, before I proceed to
9    sentence your client, I'd like to give you an opportunity to
10   speak, to say anything you want to say on your client's
11   behalf, any argument in support of a departure or a variance.

12          MR. RASKIN:  Sure, your Honor.  Thank you.

13          As you know, the defendant in this case has accepted
14   responsibility, pled guilty to a criminal offense.  In
15   addition to that, the defendant has cooperated fully with the
16   Government, has disciplined and, in fact, dismissed
17   wrongdoers in this case, and has implemented a substantial
18   remedial program in order to ensure that this type of
19   wrongdoing doesn't occur again.

20          For those reasons, consistent with the parties
21   agreement, we would ask respectfully that the Court impose a
22   relatively small variance and sentence the defendant
23   consistent with the parties plea agreement.

24          THE COURT:  Mr. Raskin, just a couple quick
25   questions.  Which is the -- I saw, of course, the different

1   agreements with various regulators throughout the world

2   really.  Which is the principal regulator that is going to

3   monitor and ensure compliance with the internal

4   organizational changes, the firewall, things like that, at

5   RBSSJ?

6            MR. RASKIN:  In the first instance, it's the CFTC

7   here in the United States.  It's one of the attachments to

8   the DPA in your other case, contains the nuts and bolts of

9   those requirements.  It's the CFTC in the first instance, but

10  the bank has also been keeping other regulators, including

11  the Department of Justice, apprised of the work that's being

12  done in that regard.

13           THE COURT:  And the CFTC's -- I have not -- I have

14  read at some point the agreement or the portions of the

15  agreement that were filed with the DPA.  Refresh my memory,

16  though, as to how the CFTC enforces that.  Are there periodic

17  updates?  Do they do surprise inspections?  How does that

18  work?

19           Mr. Goldfarb, if you want to speak to that, too.

20  Either one of you is fine.

21           MR. GOLDFARB:  Thank you, your Honor.

22           I just wanted to add to what counsel has said.  RBS,

23  as you know, is a global bank and has multiple regulators

24  globally.  Mr. Raskin is correct that the CFTC is taking

25  primary responsibility with respect to the settlement, but

1    RBS's principal regulator is the FCA in the UK and they are

2    very actively involved in overseeing its operations and

3    ensuring its compliance.  And the FCA was a party to a

4    settlement with RBS in the LIBOR matter as well.  So I didn't

5    want to leave that out.

6         We are meeting on a regular basis here in the U.S.

7    with the CFTC and, indeed, with the Department of Justice to

8    keep them informed of our compliance efforts and on the

9    execution of our compliance program and the fulfillment of

10   the commitments that we've made to the CFTC.

11        So in answer to your question, we are meeting

12   regularly with the CFTC and providing them quarterly reports

13   of our progress in meeting our commitments under the

14   settlement.

15        THE COURT:  And I presume the CFTC has subpoena

16   power if it needs further information that it wants to get by

17   court order.

18        MR. GOLDFARB:  They do, your Honor.

19        THE COURT:  Mr. Goldfarb, you also have the right to

20   make a statement today on behalf of the company.  You're not

21   required to say anything.  You've already made some comments.

22   You're welcome to add to those and I would be interested in

23   anything you might wish to say but, as I say, you're not

24   required to say anything.

25        MR. GOLDFARB:  The only thing I would add is that

1    RBS has taken this matter very seriously and to heart.  There

2    have been changes in senior management at RBS.  Mr. Raskin

3    mentioned the wrongdoers in this case have been dismissed by

4    the company.  But most importantly, I think the thing I'd

5    like to mention is that there's a new tone at the top that's

6    being set within RBS, and there is a -- from the Board of

7    Directors to the new CEO on down, there is a very strong

8    message that's gone out that this kind of behavior will no

9    longer be tolerated.  And RBS is a large organization, over

10    120,000 people worldwide.  It's a little like a battleship,

11    it does take some time to turn, but we're doing everything in

12    our power to change that tone and make sure that people

13    understand that compliance with laws and regulations is a

14    primary responsibility of everyone.

15          THE COURT:  Thank you.

16          Mr. Raskin, anything else?

17          MR. RASKIN:  Nothing more, your Honor.

18          THE COURT:  Would the Government like to speak?

19          MR. WINTERS:  Just very briefly, your Honor.  I

20    would say that the Government believes that this conduct is

21    very serious.  You've heard from the defendant about their

22    recognition of the seriousness of the conduct.  We believe

23    that the fine of 50 million dollars that's negotiated as part

24    of the plea agreement, and which we would ask the Court to

25    accept, is an appropriate fine given the seriousness of the

1    misconduct.  We also believe a slight variance below the

2    Guidelines range is appropriate given all the other fines

3    that RBS is paying.  And as we described in the sentencing

4    memorandum, this is part of a larger set of fines that RBS is

5    paying both to the Justice Department and also that other

6    regulators have imposed on RBS.

7           So we believe that the conduct was very serious

8    misconduct.  RBS has continued to cooperate, is engaged in

9    remedial efforts, and we'd ask the Court to accept the 50

10   million dollar fine as the appropriate fine under the plea

11   agreement.

12          THE COURT:  Thank you.

13          Attorney Raskin, I had one other question for you

14   which I forgot to ask.  What is the status -- is there a

15   civil MDL in the Southern District?

16          MR. RASKIN:  There is, your Honor.

17          THE COURT:  What's going on in that?  Is it just

18   initial setup right now or how far along?

19          MR. RASKIN:  I believe that it's currently on

20   appeal.  I think there are counts that were dismissed.  Those

21   are on appeal and the remaining counts are, I think, stayed

22   pending appeal.

23          THE COURT:  So there was an interlocutory appeal

24   then?

25          MR. RASKIN:  Yes.

1          THE COURT:  Interesting.

2          MR. RASKIN:  Discovery has been stayed.

3          THE COURT:  Until the resolution of the appeal.

4          What is it that -- you don't have to give me all the

5    counts -- what counts remain?  In terms of assuming the

6    dismissal of the counts is affirmed, do you have a sense of

7    what counts remain?

8          MR. RASKIN:  I do not, your Honor.

9          THE COURT:  Is it fair to say that even if RBS is

10   successful in having the judgment or the interlocutory ruling

11   dismissing some of the counts affirmed, that there is at

12   least one count that's going to go forward?

13         MR. RASKIN:  I'll have to check that, your Honor.

14         THE COURT:  Well, it is what it is.

15         MR. RASKIN:  Mr. Berringer may have some

16   information.

17         MR. BERRINGER:  Your Honor, so there are two

18   separate actions currently going on in the Southern District.

19   There's the U.S. dollar MDL which is currently on appeal.

20   But separate and apart from that, there's a yen class action

21   that's also currently pending.  And that's pending before

22   Judge Daniels.  And I believe that no counts have been

23   dismissed from that case yet.  And that's the case where

24   RBSSJ --

25         THE COURT:  Is a defendant.  Okay.  Well, that's

1    helpful information.  Thank you.

2         We're ready to turn to the imposition of sentence.

3         I accept the plea agreement that was signed and

4    filed on April 12, 2013, including the specific disposition

5    set forth in the plea agreement under Rule 11(c)(1)(C).  I'm

6    satisfied that the agreement adequately reflects the

7    seriousness of the actual offense behavior and that accepting

8    it will not undermine the purposes of sentencing.

9         I find that a sentence outside the Guidelines range,

10   in particular, the agreed upon disposition of a 50 million

11   dollar fine and compliance with the other conditions set

12   forth in the plea agreement is sufficient, but not greater

13   than necessary to fulfill the purposes of sentencing,

14   particularly just punishment, the seriousness of the offense

15   and deterrence.

16        The parties have negotiated this plea agreement as

17   part of a larger complex disposition of enforcement

18   proceedings brought by multiple law enforcement agencies and

19   jurisdictions across the world.  Some of those agencies, such

20   as the CFTC, has substantially greater expertise than this

21   Court in fine tuning the steps the defendant and its parent

22   need to take to avoid repetition of this conduct, and it

23   appears that the steps they have taken, and the steps RBS has

24   taken under their supervision, are substantial and are aimed

25   at deterring this behavior.

1        I also note that even the imposition of a

2   substantial higher fine by this Court would make ultimately

3   no difference in the overall picture of monetary sanctions

4   imposed on the RBS family of companies, as whatever I impose

5   will be subtracted from the global penalty of 150 million set

6   forth in the deferred prosecution agreement under provisions

7   of that agreement.  That agreement was filed in this Court

8   and is also available on the Department of Justice website.

9        I further note that with regard to any victims,

10  none has appeared in this proceeding or at the plea hearing,

11  despite broad notice of this proceeding and the plea hearing

12  proceeding on the Internet and in financial publications

13  around the world, suggesting perhaps either a lack of

14  interest, a lack of evidence of direct concrete harm, or an

15  acknowledgement that any such harm is complex and difficult

16  to prove, although I want to be clear that I express no views

17  on any issues related to harm, damages, or the amount of the

18  loss or the gain other than finding that the Government's

19  approximation of the loss is a reasonable one and provides a

20  basis for this Court to accept a fine exceeding one million

21  dollars.

22       The Court also notes that civil litigation is

23  pending in which any injured parties would presumably have an

24  opportunity to seek redress.

25       The only other comment I would make is that while I

1  am certainly not, I think, of the school of some of my

2  colleagues in the sense that I think it's appropriate for me

3  to get involved deeply in the quality of a corporate

4  disposition in a criminal case where it's clearly been

5  negotiated by sophisticated and competent counsel, and

6  especially in light of the fact that it's only a piece of a

7  larger disposition, I will simply say that my own view is

8  that prosecution of individuals involved is critical to

9  deterring this conduct and likely to be far more successful

10  in doing than this or any other corporate disposition, but it

11  doesn't sound like that possibility's foreclosed here and I

12  think the Government's focused and all that they can say

13  about that.

14       I impose no restitution because under Section

15  3663A(c)(3) of Title 18, I find that determining very complex

16  issues of fact related to the cause or amount of any losses

17  would complicate or prolong the sentencing process to a

18  degree that the need to provide restitution to any victim is

19  outweighed by the burden on the sentencing process.

20       I impose no term of probation because I do not find

21  that the conditions in Section 8D1.1(a) of the Guidelines are

22  present, nor do I find that there is a likelihood of

23  recidivism in light of the measures that the company has put

24  in place under the supervision of regulatory agencies.

25  Moreover, as I say, I do find that the involvement of those

1   agencies provide adequate ongoing supervision of RBSSJ.

2           The defendant shall pay a mandatory assessment of

3   $400.

4           Does either counsel know of any reason the sentence

5   I've described cannot legally be imposed as a sentence of the

6   Court?

7           MR. RASKIN:  The defense does not, your Honor.

8           MR. WINTERS:  Not from the Government, your Honor.

9           THE COURT:  The sentence I've set forth is hereby

10  imposed as the sentence in this case.  The judgment of the

11  Court will be prepared for my signature by the Clerk's Office

12  in consultation with the Probation Office.

13          My understanding from the plea agreement is that the

14  Defendant has waived its right to appeal the conviction and

15  sentence.  I will, nonetheless, advise the defendant of its

16  right to appeal because under certain narrow conditions

17  waivers can be voided.

18          If the defendant wishes to appeal, it must file a

19  written notice of appeal within 14 days of the entry of

20  judgment.

21          Mr. Goldfarb, do you understand the time limit for

22  filing a notice of appeal?

23          MR. GOLDFARB:  Yes, I do, your Honor.

24          THE COURT:  Very well.  Are there any other matters

25  to take up today?

1          MR. WINTERS:  Not from the Government.

2          MR. RASKIN:  Not from the defense, your Honor.

3          THE COURT:  I want to thank counsel for their

4    cooperation with the Probation Office and for earlier on in

5    this matter helping to educate the Court about this

6    proceeding and about how we should proceed.

7          At this point, we'll be in recess.

8          Oh, I'm sorry.  One other thing.

9          I think the plea agreement calls for payment within

10   10 days, is that right?  10 days of judgment?

11         MR. WINTERS:  I believe it's 10 days of

12   sentencing.

13         THE COURT:  I think it calls for payment to be made

14   to the Clerk's Office, is that right?  What I would suggest,

15   Attorney Raskin, is just getting in touch with the Clerk's

16   Office in New Haven.  50 million is a lot for them.  And

17   they've done it before, but it's been several years.  I did

18   reach out to them just to talk to them about the arrangements

19   for that.

20         MR. RASKIN:  Yes.  We have been in touch with them

21   and will continue to make sure that it's transferred

22   correctly.

23         THE COURT:  Very well.  With that, we'll be in

24   recess.  Thank you.

25         (Concluded.)

1          C E R T I F I C A T E

2

3          I, Martha C. Marshall, RMR, CRR, hereby certify that

4    the foregoing pages are a complete and accurate transcription

5    of my original stenotype notes taken in the matter of United

6    States v. RBS Securities Japan Limited, which was held before

7    the Honorable Michael P. Shea, U.S.D.J, at 450 Main Street,

8    Hartford, Connecticut, on January 6, 2014.

9

10

11

12                              _____
                                Martha C. Marshall, RMR,CRR
13                              Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25